RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0125p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 16-3548

IRAEPHRAIM X. UNDERWOOD,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for
the Northern District of Ohio at Youngstown.
No. 4:15-cr-00096—Patricia A. Gaughan, District Judge.

Argued:  April 27, 2017

Decided and Filed:  June 13, 2017

Before:  GUY, SILER, and DONALD, Circuit Judges.

_____

## COUNSEL

**ARGUED:**  Catherine J. Adinaro, FEDERAL PUBLIC DEFENDER'S OFFICE, Cleveland, Ohio, for Appellant. Michael A. Sullivan, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.  **ON BRIEF:**  Catherine J. Adinaro, FEDERAL PUBLIC DEFENDER'S OFFICE, Cleveland, Ohio, for Appellant. Benedict S. Gullo, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

_____

## OPINION

_____

SILER, Circuit Judge.  Iraephraim Underwood appeals his conviction of one count of crossing a state line with intent to engage in a sexual act with his step-granddaughter, a minor, in violation of 18 U.S.C. § 2241(c), and one count of transporting his step-granddaughter in

interstate commerce with the intent that such person engage in unlawful sexual activity, in violation of 18 U.S.C. § 2423(a). On appeal, Underwood argues that the district court erred in allowing his wife, his daughter, and a sexual assault nurse to testify at his trial. He argues that by allowing his wife to testify, the district court violated both the confidential marital communications privilege and the adverse spousal testimony privilege. He also argues that the district court erred in allowing his daughter and the sexual assault nurse to testify in violation of Federal Rules of Evidence 403 and 803(4). We affirm because the district court did not err in any of these evidentiary rulings.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2014, Underwood's step-granddaughter ("Jane")[1] told her mother that Underwood had sex with her in August 2014 when the two were on a trip to Michigan. According to Jane, she and her cousin ("John")[2] had gone on a work trip with Underwood in his semi-truck. Jane, John, and Underwood first went to Pennsylvania. After Underwood took John back home, Underwood took Jane to Michigan with him.

According to Jane, when they arrived in Michigan, Underwood sexually assaulted her. After learning of the allegations, Jane's mother took Jane to the local hospital and then to the Children's Advocacy Center. John also accused Underwood of sexual misconduct and was taken to the Advocacy Center.

In 2015, a three count superseding indictment was filed against Underwood. The indictment charged him with one count of crossing state lines with the intent to engage in a sexual act with Jane, and two counts of transporting a person, under the age of eighteen, in interstate commerce, with the intent that such person engage in unlawful sexual activity (one count for each Jane and John).

In 2016, Underwood was tried for the indicted charges. During the trial, the government presented three witnesses that are the subject of this appeal. It called Underwood's wife ("Cora") to testify. Over a marital communications privilege objection, Cora testified that she

---

[1] Jane is a fictitious name to protect the minor child.

[2] Also a fictitious name to protect the minor.

became increasingly concerned about Underwood's favoritism toward Jane. Cora also testified about an incident when she left Underwood and Jane at home alone and found that Underwood had changed their bed linens. Finally, Cora testified about text messages and four voicemails that she received from Underwood. In the text messages, Underwood denied sexually assaulting John, but he did not deny assaulting Jane. In the voicemails, Underwood apologized for not being a perfect man.

The government also called Underwood's adult daughter and Jane's sexual assault examiner Nurse Gorsuch. Underwood's daughter testified about being sexually abused by Underwood in 1992—an incident for which Underwood pleaded guilty to Forcible Sexual Abuse. Nurse Gorsuch testified about her interview with Jane concerning the sexual assault.

The jury convicted Underwood of aggravated sexual abuse of a child and transporting a minor as it related to Jane and acquitted him of the count relating to John. The district court sentenced Underwood to life on both counts to be served concurrently.

## DISCUSSION

### I. Spousal Testimony

#### a. Standard of Review

We review a district court's admission or exclusion of evidence for an abuse of discretion. *United States v. Henderson*, 626 F.3d 326, 333 (6th Cir. 2010). The abuse of discretion standard also applies to a district court's evidentiary rulings made in the context of the marital privilege. *See United States v. Flemming*, 658 F. App'x 777, 787 (6th Cir. 2016) (citing *United States v. Morales*, 687 F.3d 697, 701–02 (6th Cir. 2012)). However, the determination of whether a common law privilege exists and the contours of that privilege are reviewed de novo. *See United States v. Hayes*, 227 F.3d 578, 581 (6th Cir. 2000).

A district court's finding of a waiver of an evidentiary privilege is reviewed de novo. *In re Grand Jury Proceedings Oct. 12, 1995*, 78 F.3d 251, 253–54 (6th Cir. 1996).

**b.** **Confidential Marital Communications Privilege**

Underwood argues that the district court erred in admitting Cora's testimony in violation of the confidential marital communications privilege.

There are two types of marital privilege. *United States v. Sims*, 755 F.2d 1239, 1240 (6th Cir. 1985). The first privilege is the adverse spousal testimony privilege. *Id*. "[T]he witness-spouse alone has a privilege to refuse to testify adversely," and the witness-spouse may be neither compelled to testify nor foreclosed from testifying under the privilege. *Id.* (quoting *Trammel v. United States*, 445 U.S. 40, 53 (1980)). The second type of privilege is the confidential marital communications privilege. *Id*. at 1241. For this privilege, the defendant-spouse retains the privilege to foreclose testimony regarding confidential marital communications. *Id.* To successfully assert the confidential marital communications privilege, three requirements must be met: (1) at the time of the communication there must have been a marriage recognized as valid by state law; (2) the privilege applies only to utterances or expressions intended by one spouse to convey a message to the other; and (3) the communication must be made in confidence. *See United States v. Porter*, 986 F.2d 1014 (6th Cir. 1993).

While neither party disputes that all three requirements have been met in this case, that does not conclude the inquiry. Federal Rule of Evidence 501 states that "common law—as interpreted by the United States courts in the light of reason and experience—governs a claim of privilege." In *Trammel*, the Supreme Court noted that the intention of Congress was "not to freeze the law of privilege" but to give the courts flexibility to make changes on a case-by-case basis. 445 U.S. at 47. Using this guidance, federal courts have created various exceptions to allow admission of spousal testimony over a defendant's objection. For example, we have recognized that confidential marital communications are unprotected when they pertain to joint criminal activity, *see Sims*, 755 F.2d at 1243, and when the parties are permanently separated but still legally married, *Porter*, 986 F.2d at 1019. Other federal courts have also created an exception to the privilege in instances in which the spouse commits an offense against the other spouse. *See Trammel*, 445 U.S. at 46, n.7; *Wyatt v. United States*, 362 U.S. 525, 529 (1960).

Most significant to this case, several circuit courts have recognized an exception to the communications privilege where the communications concern allegations of child abuse ("child-abuse exception"). *See United States v. Breton*, 740 F.3d 1, 12 (1st Cir. 2014) (extending the offense-committed-against-the-spouse exception to the marital communications privilege for an offense against a child of either spouse to promote marital and family harmony); *United States v. Bahe*, 128 F.3d 1440, 1446 (10th Cir. 1997) (upholding admission of spousal testimony and finding "no significant difference, as a policy matter, between a crime against a child of the married couple, against a stepchild living in the home or, as here, against an eleven-year-old relative visiting in the home" because "child abuse is a horrendous crime"); *United States v. White*, 974 F.2d 1135, 1138 (9th Cir. 1992) (upholding admission of spousal testimony because exclusion of such testimony is inconsistent with public policy concerns to protect a spouse or the spouse's children)[3]; *United States v. Cameron*, 556 F.2d 752, 755 (5th Cir. 1977) (recognizing a child-abuse exception to marital communications privilege); *United States v. Allery*, 526 F.2d 1362, 1367 (8th Cir. 1975) (communications unprotected since child abuse allegations involved spouse's child). In addition to the federal circuit courts, state courts have also accepted the child-abuse exception in varying degrees. *Compare Ludwig v. State*, 931 S.W.2d 239, 244 (Tex. Crim. App. 1996) (en banc) (finding the state evidentiary rule to establish an exception to marital communications privilege in any crime against any minor child), *with Johnson v. United States*, 616 A.2d 1216, 1219–25 (D.C. App. 1992) (establishing exception for crimes against children of either spouse under the common law).

After a thorough review of cases applying a child-abuse exception to the marital communication privilege, we find *Breton* and *Bahe* the most persuasive using "reason and experience" to guide a case-by-case analysis. *Trammel*, 445 U.S. at 47. In *Breton*, the First Circuit provided an extensive rationale, first enunciated in *Allery*, for why the "offense against spouse" exception should extend to an offense against a child of either spouse. 740 F.3d at 10–11. First, a crime against a spouse's child, like a crime against a spouse, profanes the deep bond of trust and love between marital partners and disrupts family harmony. *Id.* at 11. Second, there is a greater-than-usual need for critical, parental testimony in prosecutions for crimes against

---

[3]The Ninth Circuit has refused to extend the child-abuse exception to a grandchild that the court deemed was not the "functional equivalent" of a child. *See United States v. Banks*, 556 F.3d 967, 976 (9th Cir. 2009).

children, since "[t]ragically and perversely, child abuse occurs most often in the home at the hands of a parent or parent-substitute." *Id.* Third, "like all privileges, the marital privileges hamper the truth-seeking process and must be interpreted narrowly." *Id.* Fourth, and finally, "there is overwhelming state legislative and judicial authority for the proposition that a crime against a spouse's child renders the marital communications privilege inapplicable." *Id.*; *see also* Emily C. Aldridge, *To Catch a Predator or to Save His Marriage: Advocating for an Expansive Child Abuse Exception to the Marital Privileges in Federal Courts*, 78 Fordham L. Rev. 1761, 1784–87 (2010) (providing a detailed list of state laws codifying a child-abuse exception to the marital communications privilege).

In *Bahe*, the Tenth Circuit announced its adoption of the child-abuse exception to the marital communications privilege, stating "[i]t would be unconscionable to permit a privilege grounded on promoting communications of trust and love between marriage partners to prevent a properly outraged spouse with knowledge from testifying against the perpetrator of such a crime." 128 F.3d at 1446. Significantly, the *Bahe* court extended the child-abuse exception to abuse of a relative visiting the home and not a child of either spouse. The court noted that it saw "no significant difference, as a policy matter, between a crime against a child of the married couple, against a stepchild living in the home or, as here, against an eleven-year-old relative visiting in the home" because "[c]hild abuse is a horrendous crime." *Id.*

Using *Breton*'s and *Bahe*'s reasoning to guide our fact-intensive inquiry, the child-abuse exception allows Cora's testimony in this case.[4] First, Underwood's sexual abuse of Cora's granddaughter "profane[d] the deep bond of trust and love between" Underwood and Cora and disrupted family harmony.[5] *Breton*, 740 F.3d at 11. In the evidence at issue, Underwood tacitly admitted to raping Cora's granddaughter. Second, the evidence showed that Underwood sexually abused Cora's granddaughter when he was the parental-substitute. *Id.* ("Tragically and perversely, child abuse occurs most often in the home at the hands of a parent or parent-

---

[4]The government would have us adopt a far-reaching child abuse exception, but we decline to do so here. Whether the exception exists requires a case-by-case analysis, *see Trammel*, 445 U.S. at 47; thus, this holding is not meant to provide a blanket exception to all future child abuse cases.

[5]Although Underwood holds this privilege, we view the facts from Cora's perspective because the child-abuse exception is an extension of the crime-against-the-spouse exception.

substitute."). This was not a case where Underwood was an "occasional caregiver." *See Banks*, 556 F.3d at 977. Instead, Cora's granddaughter regularly went on trips with Underwood to Pennsylvania and Michigan in his truck. During these trips, Cora's granddaughter was in the sole care and custody of Underwood. Third, we, like the court in *Bahe*, see "no significant difference, as a policy matter" whether the crime was committed against Cora's daughter or granddaughter. 128 F.3d at 1446. Just like the spouse's own child, the granddaughter would serve as a proxy for Cora's injury. Finally, we see no significant difference that this crime did not occur in Underwood's home, but rather occurred in his "sleeper truck."[6] Underwood's "sleeper truck" is the functional equivalent of his home as it has sufficient living quarters and Underwood would stay in the truck during his overnight trips.

The district court did not abuse its discretion in allowing Cora's testimony in this case.

### c. Testimonial Privilege

Underwood argues that, even if the child-abuse exception applies, the district court violated due process when it failed to affirmatively find that Cora knew she had a voluntary right to refuse to testify.

Underwood cannot raise this claim. The witness-spouse alone has a privilege to refuse to testify adversely. *Trammel v. United States*, 445 U.S. 40, 53 (1980). Therefore, Underwood holds no right to the privilege and thus lacks standing to raise the issue on appeal. *See United States v. Anderson*, 39 F.3d 331, 350 (D.C. Cir. 1994) (finding defendant-spouse without standing to contest a district court's decision to compel the spouse to testify) (vacated on other grounds); *United States v. Lofton*, 957 F.2d 476, 477 n.1 (7th Cir. 1992) (holding that "Lofton would have no standing to appeal the district court's determination that his wife waived her spousal testimonial privilege"); *Grand Jury Subpoena of Ford v. United States*, 756 F.2d 249, 255 (2d Cir. 1985) ("[Wife] argues that, where the witness-spouse invokes the privilege and the

---

[6]At oral argument, Underwood's counsel argued that this distinction was important because Cora was not present during the child abuse. However, as opposing counsel correctly pointed out, this case concerns marital communications, not direct evidence of the spouse's witnessing the child abuse. Therefore, the fact that the spouse was not present during the act is irrelevant.

government attacks his exercise of it, the non-witness spouse must be allowed to intervene.  This argument is without merit . . . .").

## II.     Daughter's Testimony

### a.      Standard of Review

We review a district court's admission or exclusion of evidence for abuse of discretion. *United States v. Henderson*, 626 F.3d 326, 333 (6th Cir. 2010).  The same standard applies to a district court's admission of prior acts of child molestation.  *United States v. Trepanier*, 576 F. App'x 531, 534 (6th Cir. 2014).

### b.      Federal Rule of Evidence 414

Underwood argues that the district court erred in permitting his daughter's testimony about conduct that occurred over twenty years prior to the trial.  According to Underwood, the prejudicial value of this testimony far exceeded the probative value in violation of Federal Rule of Evidence 403.

In 1994, Congress enacted Federal Rule of Evidence 414 as part of the Violent Crime Control and Law Enforcement Act.  PL 103-322, § 320935(a), 108 Stat. 1796.  Rule 414(a) states, "[i]n a criminal case in which a defendant is accused of child molestation, the court may admit evidence that the defendant committed any other child molestation.  The evidence may be considered on any matter to which it is relevant."  Rule 414 "create[s] an exception to the general ban on propensity evidence contained in Rule 404(b)."  *United States v. Seymour*, 468 F.3d 378, 384–85 (6th Cir. 2006).  This relevant evidence of a defendant's other crimes of child molestation is admissible unless its probative value is substantially outweighed by the danger of unfair prejudice.  *See United States v. Sanchez*, 440 F. App'x 436, 439–40 (6th Cir. 2011).

In this case, Underwood argues that the testimony should not have been admitted because of the timeframe between the Rule 414 conduct and the trial.  This argument is unpersuasive.  In *United States v. Gabe*, the Eighth Circuit allowed the admission of a twenty-year-old uncharged child molestation act under Rule 414.  237 F.3d 954, 959–60 (8th Cir. 2001).  In doing so, the court noted that "it is reasonable to assume that a victim of child abuse is not likely to forget

such a traumatic event," thus eliminating the concern of reliability issues. *Id.* at 960. This opinion is directly in line with the legislative intent of the Violent Crime Control and Law Enforcement Act, which promoted Rule 414. During its introduction, the Principal House Sponsor noted, "*No time limit* is imposed on the uncharged offense for which evidence may be admitted." 140 Cong. Rec. H8968—01, H8991 (daily ed. Aug. 21, 1994) (emphasis added).

Next, Underwood argues that his daughter's testimony about his sexually assaulting her more than twenty years prior lacks any probative value because his theory of the case only challenged whether he had the intent to engage in illicit sexual conduct when he crossed state lines. Although Underwood's opening statement suggested that he was only challenging whether he possessed the requisite intent and not whether he committed the sexual act itself, the district court did not abuse its discretion because it would not know until the closing argument if this was truly the "theory of the case." As with any criminal case, the government always has the burden of proof. Therefore, if the government failed to carry this burden, the defendant could have changed his theory at closing argument.

Furthermore, we have already held that if the charged conduct and the prior Rule 414 conduct are "sufficiently similar," the prejudicial effect of such evidence is outweighed by its probative value. *See Sanchez*, 440 F. App'x at 438–40. In this case, there were numerous similarities between the sexual assaults of Underwood's daughter and step-granddaughter: both were juveniles (daughter was ten and step-granddaughter was between eleven and twelve), both were penile penetrated by Underwood, both had a familial relationship, and both occurred when Underwood was able to isolate the individuals alone at a time of vulnerability.

Thus, the district court properly admitted the daughter's testimony under Rule 414.

## III. Nurse Gorsuch's Testimony

### a.       Standard of Review

When a party does not object to a witness's testimony, we review the district court's admission of that testimony for plain error. *United States v. Kappell*, 418 F.3d 550, 554 (6th Cir. 2005). "To show plain error, a defendant must show (1) error (2) that was obvious or clear, (3)

that affected defendant's substantial rights and (4) that affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Wallace*, 597 F.3d 794, 802 (6th Cir. 2010) (citing *United States v. Vonner*, 516 F.3d 382, 385–86 (6th Cir. 2008) (en banc)). A finding of plain error is warranted only in "exceptional circumstances," that is, "where the error is so plain that the trial judge . . . [was] derelict in countenancing it." *Vonner*, 516 F.3d at 386.

**b.     Analysis**

Underwood argues that the district court erred in allowing Nurse Gorsuch, Jane's sexual assault nurse examiner, to testify about inadmissible hearsay that only bolstered Jane's own testimony. In response, the government argues that the district court did not commit plain error because Jane's evaluation was undertaken "for the primary purpose of medical diagnosis." *Kappell*, 418 F.3d at 556–57.

Under Federal Rule of Evidence 803(4), statements are admissible if they are made "for the primary purpose of medical diagnosis, rather than for some other purpose, such as determining whether to notify state authorities of suspected abuse, deciding whether a protective order was necessary to ensure the children's safety, or obtaining evidence." *Id.* (internal citations omitted).

At trial, the government asked Nurse Gorsuch to "generally give [the jury] an idea of what [Nurse Gorsuch] knew about the allegations, based on the interview [with Jane]." In response to that question, Nurse Gorsuch stated, "You're asking me what Jane said about the incident?" The government then replied, "Yeah, to the degree it helped you frame your exam. If you could tell us what you learned." Nurse Gorsuch then testified:

> Jane said that she was there because of concerns about her step-grandfather, Ira Underwood. She said that the last time anything happened was in around September, 2014. And she described an incident where she went with him on a semi truck. She and her cousin, [John], went bowling with him and then they went on the semi truck to Pennsylvania, then they came back and dropped [John] off at his home and Jane and Mr. Underwood went to Michigan. And she said he had to rest for two hours. So she got in the top bunk and was on the phone, and he got on the bottom bunk. She had to go to the restroom and they were stopped in a place where there was a cluster of stores, a gas station and a CVS and a Myers, and she came back from the restroom, and he was -- when she got in the truck, he

was naked.  He pulled her into the lower bunk of the trunk [sic] and pulled off her jeans and underwear and then he put his penis in her vagina.

Nurse Gorsuch's testimony also continued by stating that:

And then she described a couple of other incidents. She said the first time anything happened, she was 10 or 11. She wasn't sure exactly. And she was at her grandmother's home, and grandmother asked her to go up to grandmother's bedroom to get her watch. So she went up there, and Mr. Underwood came in the room, shut and locked the door, pushed her on the floor, and tried to put his penis in her vagina. She said that he couldn't get it in there so he asked her not to tell. He said he would do -- give her anything she wanted if she wouldn't tell.

Underwood argues that the majority of these statements had no bearing on the medical diagnosis or treatment.  Specifically, Underwood argues that the identification of the perpetrator was irrelevant.  *See Gabe*, 237 F.3d at 957–58 ("In general, a patient's statement describing how an injury occurred is pertinent to a physician's diagnosis and treatment, but a statement identifying the person who caused the injury would seldom, if ever, be sufficiently related." (internal quotation marks and citation omitted)).  While it is true that the identification of the perpetrator may usually not have any medical significance, such error is not plain in this case.  For example, Nurse Gorsuch may have wanted to ensure that the perpetrator was not present in the room so that she could get a truthful evaluation without the child's fearing future retaliation.

Furthermore, the other statements that Underwood attacks—i.e., that they went bowling before the incident and the truck was parked around a CVS—could also have medical significance.  For example, the distance it took Underwood to walk and get the "morning after pill" could be significant to Nurse Gorsuch's medical evaluation as it provides a timeframe between the sexual assault and the subsequent medication that Jane took.  Furthermore, Gorsuch stated that she "absolutely" relies on the information she learns in the interview:

Well, the information that the interviewer collected, and then I listen to, gives me guidance about what kind of tests I might need to do. Depending on what the child says, I may do blood tests or not. So that's real [sic] important to know. It also gives me an idea of what to look for during the exam.

Therefore, we cannot find that the district court's ruling was an "obvious or clear" error or that the district court was "derelict in" its duties.  *Wallace*, 597 F.3d at 802; *Vonner*, 516 F.3d at 386.

**IV.**     **Cumulative Error**

In his final challenge, Underwood argues that cumulative error should result in his receiving a new trial.  To prevail under cumulative-error analysis, a defendant "must show that the combined effect of individually harmless errors was so prejudicial as to render his trial fundamentally unfair." *United States v. Warman*, 578 F.3d 320, 349 n.4 (6th Cir. 2009) (citation omitted).  Because cumulative error analysis examines only actual errors, "the accumulation of non-errors cannot collectively amount to a violation of due process." *Campbell v. United States*, 364 F.3d 727, 736 (6th Cir. 2004) (internal quotation and citation omitted).

**AFFIRMED**.