**NOT RECOMMENDED FOR PUBLICATION**
File Name: 18a0561n.06

**No. 17-6023**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Nov 06, 2018
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| MIGUEL DAVID AYALA, | ) | DISTRICT OF KENTUCKY |
| | ) | |
| Defendant-Appellant. | ) | |

---

**BEFORE: COLE, Chief Judge; WHITE and NALBANDIAN, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.**

A jury convicted David Miguel Ayala of one count of armed robbery involving a controlled substance in violation of 18 U.S.C. § 2118(a)(1) and one count of possession of a controlled substance with intent to distribute in violation of 21 U.S.C § 841(a)(1). On appeal, Ayala challenges the sufficiency of the evidence against him, argues that the court erroneously allowed the introduction of portions of a recorded conversation between Ayala and his wife, and argues that his trial counsel was ineffective for failing to request a competency hearing before trial. Ayala also challenges the sentencing court's application of firearms enhancements under the Guidelines. We affirm Ayala's convictions and sentence.

## I. BACKGROUND

In May 2015, Ayala appeared before the Eastern District of Kentucky for a revocation hearing concerning violations of the terms of his supervised release on an unrelated earlier

conviction.[1] The court ordered Ayala to attend an in-patient rehabilitation program, but Ayala left the program after a short stay because the program allegedly required him to stop using his psychiatric medication.

On July 9, 2015, police attempted to arrest Ayala for violating the terms of his supervised release by leaving the in-patient program.[2] Police contacted Diana Palmer, Ayala's wife, who informed them that Ayala had returned home the previous day with thousands of Vicodin pills. Palmer gave those pills to the police, told the police where she and her husband had disposed of the bottles originally containing the pills, and told the police where they could locate Ayala. Police arrested Ayala later that day, and Palmer accompanied them to the police station to give a statement. While at the station, Palmer received a call from Ayala—who was then in jail—and put the call on speakerphone so the police could hear and record the call.

Ayala was subsequently charged with one count of robbery involving a controlled substance in violation of 18 U.S.C. § 2118(a)(1) and one count of possession of a controlled substance with intent to distribute in violation of 21 U.S.C § 841(a)(1). Both charges were premised on allegations that Ayala had stolen approximately 4,000 hydrocodone pills at gunpoint from a Rite Aid pharmacy in Lexington, Kentucky.

## A. Pre-Trial Evidentiary Motions

Ayala filed a number of pre-trial evidentiary motions, but the only issue on appeal concerns his motion "to prohibit his former spouse[3] . . . from testifying as to any and all confidential communications he made to her during their marriage." (R. 28, PID 108.) In particular, Ayala

---

[1] Ayala had pleaded guilty in November 2009 to aiding and abetting bank robbery in violation of 18 U.S.C. § 2113(a). *See United States of America v. Pratt et. al*, 08-cr-191, ECF No. 170 (E.D. Ky. Nov. 6, 2009).

[2] After he was arrested in connection with the instant case, Ayala again appeared for a revocation on his prior conviction and was sentenced to two years imprisonment for violation of the terms of his supervised release.

[3] Ayala and Palmer divorced in November 2016. (R. 28, PID 108.)

attempted to bar the government from introducing the recording of Ayala's phone call with Palmer. The district court held a hearing and ultimately denied Ayala's request.

Ayala asserted that the recording was privileged as a confidential marital communication. Because Palmer took the call on speakerphone, the court noted that Ayala "can't see her when he's communicating with her" and "doesn't know who's there" and therefore concluded that Palmer had no reasonable expectation of privacy. (R. 83, PID 442.) The court also noted separately that the call "couldn't have been confidential because there's a big sign right up there in the jail . . . that says 'Hey, these conversations are being recorded, they're being listened to.'" (*Id.* at PID 445.) The court opined that the "spousal communication [privilege] is meant for pillow talk, you know, when you're in privacy" but that "if there's a big sign up there that says your conversations are being recorded," the privilege does not apply. (*Id.* at PID 446.)

Relying on those alternative grounds, the court concluded that the recording of the phone call was admissible.

## B. Trial

The evidence at trial demonstrated the following:

On the morning of July 8, 2015, a man used a firearm to rob a Rite Aid pharmacy in Lexington, Kentucky. The Rite Aid was registered with the Drug Enforcement Administration to dispense certain controlled substances. The witnesses to the robbery described the perpetrator as having a "reddish" beard and wearing "aviator sunglasses," and also noted that he was wearing latex gloves. (R. 84, PID 465–66, 470.) A pharmacist testified that he "clearly saw" the perpetrator's gun, which was "a dark color . . . like a gray"; a police officer who reported to the scene of the robbery testified that the pharmacist had told him that the perpetrator was armed with a "black handgun, semi-automatic." (*Id.* at PID 465, 477.)

The armed perpetrator handed the pharmacists a grey Wal-Mart plastic bag and told them: "You know what I want. Fill this bag up." (*Id.* at PID 466.) The pharmacists proceeded to fill the bag with bottles of hydrocodone pills, and the perpetrator stated that "nobody would be hurt if we cooperated, and, you know, just reinforcing that he was in charge; we should do what he says. When the medications were collected, we were told to get on the ground, not to get back up. In the event that we did so, somebody would get hurt." (*Id.* at PID 478.) The perpetrator obtained a total of 4,007 tablets with a replacement cost of $3,136.36. Rite Aid's security system recorded portions of the robbery, and the government introduced still images from the surveillance footage at trial. None of the eyewitnesses to the robbery identified Ayala as the perpetrator, and there was no physical evidence tying Ayala to the scene of the crime. Instead, the government relied largely on Palmer's testimony to link Ayala to the robbery.

Palmer testified that Ayala was supposed to pick her up from work at noon on July 8, 2015, but was several hours late. Ayala eventually arrived, and Palmer noticed both that Ayala had a red beard and that he was in possession of a handgun. Palmer testified that it "looked like a normal gun" and "wasn't a revolver." (R. 85, PID 657.) Palmer also observed a plastic Wal-Mart bag filled with loose pills and pill bottles labeled "Vicodin." (*Id.* at PID 657–58.) Palmer testified that she was "very freaked out" and asked Ayala "what was going on." (*Id.* at PID 658.) Although Ayala did not explain where he had gotten the pills, Palmer agreed to help him dispose of the empty pill bottles by putting them "in a plastic . . . Wal-Mart bag, tied up," and depositing them in a dumpster behind a Don Señor's restaurant in Cynthiana, Kentucky. (*Id.* at PID 659–60.) Ayala next told Palmer that they "needed to get rid of" his firearm, so they drove to a boat dock where Ayala got out of the car, wiped the gun off with a bandana, and threw it into a weeded area. (*Id.* at PID 661–62.)

Palmer and Ayala then returned to Palmer's apartment, where Ayala brought in "another bag of pill bottles and pills" from the car. (*Id.* at PID 662.) Palmer assisted Ayala by sorting the pills by dosage and storing them in color-coded Ziploc bags. When Palmer asked Ayala where he had gotten the pills, he told her that she "shouldn't concern [herself] with where they came from" and that "as far as [she] needed to know, they came from some Mexican." (*Id.* at PID 663.) Ayala told Palmer that he planned "to travel to Pike County to sell" the pills. (*Id.* at PID 716–17.)

The following day, Palmer and Ayala disposed of the remaining pill bottles in a trash can in front of a Wal-Mart in Cynthiana. The government presented photographs from Wal-Mart's security system depicting Palmer and Ayala disposing of the pill bottles in the trash, and Palmer confirmed that she and Ayala were in fact the persons depicted in the photographs.

After Palmer and Ayala left Wal-Mart, Palmer received a call from the Cynthiana Police Department asking to meet at her house. Ayala "didn't want to be there" for the meeting, so Palmer "dropped him off at his sister's house." (*Id.* at PID 668.) When Palmer met with the officers, they inquired regarding Ayala's whereabouts and informed her of the existence of a warrant for Ayala's arrest for violation of the terms of his supervised release. Palmer did not tell the officers where Ayala was, and instead called Ayala and allowed the officers to speak with him. Ayala told the officers—untruthfully—"that he was in Lexington with his mother." (*Id.* at PID 669.) The officers then left Palmer's house. After the officers had left, Palmer called them and informed them that she "had several thousand Vicodin in [her] possession and they needed to come get them." (*Id.* at PID 670.) When the officers returned, Palmer turned over the pills and told the officers that she did not know where Ayala had gotten them.

Palmer agreed to meet the officers for an interview at the police station, where she "told them everything that had transpired," including the locations of the discarded pill bottles. (*Id.* at

PID 671.) During the interview, Palmer received a phone call from Ayala, who had been arrested and was in jail. Palmer put the call on speakerphone and asked Ayala a number of questions at the officers' direction. The government played an audio recording of portions of that phone call for the jury. On the call, Ayala never explicitly mentioned the pills, but he asked whether Palmer was in any sort of trouble and repeatedly told Palmer that he loved her, and then expressed doubt as to whether Palmer loved him.

Palmer testified that the police officers came to her apartment for a follow-up interview on July 10, 2015, the day after her interview at the police station. The police showed Palmer a security photograph of the perpetrator of the Rite Aid robbery, and Palmer identified the perpetrator as Ayala based on his physical appearance, "stature, demeanor, [and] clothing." (*Id.* at PID 679.) The government introduced the photograph into evidence, and Palmer again confirmed that Ayala was the person depicted.

The government also introduced the testimony of a number of police officers who corroborated aspects of Palmer's testimony, as well as evidence that the police had recovered the discarded pill bottles in the locations identified by Palmer. Although the government recovered neither fingerprints nor DNA evidence from the recovered bottles, the government introduced evidence that the bottles had come from the Rite Aid pharmacy that had been robbed on July 8, 2015. The government also introduced cell tower records indicating that a cellphone that Palmer had testified belonged to Ayala was located in the vicinity of the Rite Aid when the robbery occurred. The police were unable to recover Ayala's firearm.

Ayala moved for a judgment of acquittal at the close of the government's case; the district court denied the motion. Ayala then called one witness to testify in his defense: his sister, Estella Ayala. Estella testified that, at the time of the robbery, Ayala was watching her children at home

but that she was not there with him. Estella also testified that she had trimmed Ayala's beard on the day before the robbery and that his beard was brown, rather than red. Estella testified that she did not recognize the perpetrator depicted in the Rite Aid surveillance footage, noting that the perpetrator's beard was untrimmed and had a "coppery undertone," unlike Ayala's. (R. 86, PID 758.) Finally, Estella testified that Ayala used a different cell phone than the one identified by Palmer.

On May 25, 2017, the jury found Ayala guilty on both counts.

### C. Post-Trial Motions and Sentencing

After the probation department prepared a Presentence Investigation Report (PSR) that referenced Ayala's psychiatric history, Ayala filed a motion seeking the release of the records described in the PSR, arguing that he was "entitled to review a copy of those records upon which the Probation Office is relying." (*See* R. 63, PID 248.) The court granted Ayala's motion, (*see* R. 64, PID 251), and Ayala moved for a downward departure from his Guidelines range based on "his lengthy mental history, as well as his substance abuse history," (R. 67, PID 259).

The PSR recommended that the court apply a five-level enhancement on the robbery charge pursuant to § 2B3.1(b)(2)(C) because Ayala brandished or possessed a firearm during the robbery and a two-level enhancement on the controlled substances charge pursuant to § 2D1.1(b)(1) because Ayala possessed a firearm in connection with the offense. Ayala objected to the enhancement, arguing that there was insufficient evidence that he had possessed a firearm "because the weapon has not been recovered." (R. 79, PID 334–35.) The court denied Ayala's objection, finding that the testimony and surveillance footage was sufficient to establish that he had possessed a firearm by a preponderance of the evidence.

After resolving the relevant objections, the court adopted the PSR and found that Ayala's Guideline range was 140–175 months imprisonment. The court then considered the applicable § 3553(a) factors and imposed a Guidelines sentence of 150 months imprisonment.

## II. DISCUSSION

Ayala advances four arguments on appeal: that he was denied the effective assistance of counsel; that the district court erred by admitting the recording of his phone call with Palmer; that the evidence was insufficient to support his convictions; and that the district court erred by applying firearms enhancements.

### A. The Record Is Insufficient to Determine Whether Ayala Received Ineffective Assistance of Counsel

Ayala argues that his trial counsel was ineffective for failing to request a competency evaluation. Ayala further argues that his counsel's request for the psychiatric records during sentencing is evidence that counsel "eventually realized" that Ayala was incompetent to stand trial. (Appellant Br. at 37.) Ayala concludes that there "is a reasonable probability that, but for counsel's errors, [Ayala] would have been evaluated as not competent to stand trial." (*Id.*) Ayala also asks us to "consider[] whether the District Court had an independent duty to *sua sponte* require a competence evaluation . . . before proceeding to trial." (Reply at 4.)

In response, the government argues that the record is insufficient to allow us to review Ayala's ineffective-assistance claim and that that claim should, instead, be raised in a post-conviction proceeding pursuant to 28 U.S.C. § 2255. The government argues that Ayala's trial counsel "has not been afforded an opportunity to answer this charge against him, and the reasons for his strategy lie completely outside the record." (Gov't Br. at 5 (internal quotations and alterations omitted).) The government also argues that Ayala "has not introduced any evidence

showing that he was incompetent to stand trial in May 2017." (*Id.* (alterations omitted) (quoting *Stewart v. Morgan*, 232 F. App'x 482, 488 (6th Cir. 2007)).)

To prevail on his ineffective-assistance claim, Ayala must show both that his counsel's performance fell below an objective standard of reasonableness and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). We are required to "indulge a 'strong presumption' that counsel's conduct 'falls within the wide range of reasonable professional assistance,'" *Adams v. United States*, 622 F.3d 608, 611 (6th Cir. 2010) (quoting *Strickland*, 466 U.S. at 689), and the "burden rests on the defendant to overcome the presumption that the challenged conduct might be considered sound trial strategy," *Hanna v. Ishee*, 694 F.3d 596, 612 (6th Cir. 2012) (citing *Strickland*, 466 U.S. at 689).

We "generally demur[] from addressing an ineffective assistance claim on direct appeal, because of the limited opportunity to develop and include record evidence that would bear on the merits of such an allegation." *Hanna*, 694 F.3d at 614; *see also United States v. Williams*, 612 F.3d 500, 508 (6th Cir. 2010); *United States v. Wunder*, 919 F.2d 34, 37 (6th Cir. 1990). "An exception exists, however, when 'the record is adequately developed to allow the court to properly assess the merits of the issue.'" *United States v. Wynn*, 663 F.3d 847, 850 (6th Cir. 2011) (quoting *Williams*, 612 F.3d at 508).

The Supreme Court has held that "the Constitution does not permit trial of an individual who lacks 'mental competency.'" *Indiana v. Edwards*, 554 U.S. 164, 170 (2008) (citing *Dusky v. United States*, 362 U.S. 402 (1960) (per curiam); *Drope v. Missouri*, 420 U.S. 162 (1975)). Courts are required to hold a competency hearing "if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to

the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a). Either party may move for such a hearing, and the court may also order a hearing sua sponte. *Id.*

The competency standard requires an inquiry into "both (1) 'whether' the defendant has 'a rational as well as factual understanding of the proceedings against him' and (2) whether the defendant 'has sufficient present ability *to consult with his lawyer* with a reasonable degree of rational understanding.'" *Edwards*, 554 U.S. at 170 (quoting *Dusky*, 362 U.S. at 402); *see also Drope*, 420 U.S. at 171. "[E]ven if the defendant is mentally ill, 'it does not follow that because a person is mentally ill he is not competent to stand trial.'" *United States v. Dubrule*, 822 F.3d 866, 875–76 (6th Cir. 2016) (alterations omitted) (quoting *United States v. Davis*, 93 F.3d 1286, 1290 (6th Cir. 1996)), *cert. denied*, 137 S. Ct. 252 (2016), and *cert. denied*, 137 S. Ct. 683 (2017) .

Ayala's ineffective assistance claim turns on (a) whether his trial counsel was ineffective for not requesting a psychiatric evaluation and competency hearing and (b) whether there is a reasonable probability that the district court would have found Ayala incompetent to stand trial. Because the record before us is insufficient to resolve either issue, Ayala's claim should properly be the subject of collateral review pursuant to 28 U.S.C. § 2255. We therefore decline to rule on Ayala's ineffective assistance claim.

**B. Whether the Trial Court Erred by Permitting the Introduction of Portions of a Recorded Conversation Between Ayala and His Wife**

Ayala next argues that the district court erroneously allowed the admission of allegedly privileged recordings of his phone conversation with Palmer. The district court relied on two grounds in finding the recording admissible: that Palmer took the call on speakerphone in the presence of police officers, and that Ayala placed the call while in jail and on notice that his calls would be monitored. As to the first ground, Ayala argues that he was "unaware that his call had

been placed on speakerphone" and "therefore had a reasonable expectation of privacy in this call with his wife." (Appellant Br. at 43.) As to the second ground, Ayala argues that "there was no evidence in the record supporting the court's conclusion regarding signage, and the court never inquired as to whether Appellant made the call from the booking area or from the housing area." (*Id.*) Ayala states that this "distinction is important, and in making an assumption without inquiry, the trial court clearly erred." (*Id.*) Ayala cites our decision in *United States v. Hadley*, 431 F.3d 484, 489 (6th Cir. 2005), for the proposition that inmates in the booking area "are not warned that calls are being recorded," while inmates in the housing area "are warned that calls will be monitored." (Appellant Br. at 43.)

The government responds that Ayala was on notice that his call would be monitored and that "Ayala cites to nothing in the record indicating that the district court clearly erred in its factual finding." (Gov't Br. at 12.) The government states that Ayala's counsel conceded that the jail informs inmates that their calls may be monitored and that, given this concession, the district court did not abuse its discretion in admitting the conversation. (*Id.* at 12–13.)

"In reviewing a trial court's evidentiary determinations, we review de novo the court's conclusions of law and review for clear error the court's factual determinations that underpin its legal conclusions." *United States v. Collins*, 799 F.3d 554, 582 (6th Cir. 2015) (alterations omitted) (quoting *United States v. Baker*, 458 F.3d 513, 516 (6th Cir. 2006)). "A factual finding is clearly erroneous when, although there may be evidence to support it, the reviewing court, utilizing the entire evidence, 'is left with the definite and firm conviction that a mistake has been committed.'" *United States v. Ellis*, 497 F.3d 606, 611 (6th Cir. 2007) (quoting *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999)).

Pursuant to Federal Rule of Evidence 501, "[t]he common law—as interpreted by United States courts in the light of reason and experience—governs a claim of privilege unless" the Constitution, a federal statute, or a rule prescribed by the Supreme Court provides otherwise. At issue here is the confidential marital communications privilege, under which a "defendant-spouse retains the privilege to foreclose testimony regarding confidential marital communications." *United States v. Underwood*, 859 F.3d 386, 390 (6th Cir. 2017). "To successfully assert the confidential marital communications privilege, three requirements must be met: (1) at the time of the communication there must have been a marriage recognized as valid by state law; (2) the privilege applies only to utterances or expressions intended by one spouse to convey a message to the other; and (3) the communication must be made in confidence." *Id.* (citing *United States v. Porter*, 986 F.2d 1014 (6th Cir. 1993)).

The parties agree that the first and second prongs of the marital privilege test are satisfied here, and the only issue is whether the communications were made in confidence. And, Ayala appears to concede that the question before us is a factual one: whether Ayala was, in fact, on notice that his call was being monitored. The district court found that he was on notice, and we review that determination for clear error.

The district court found that Ayala was on notice that the call would be monitored because he made the call from jail, where posted signs informed prisoners that all phone conversations are being recorded. There is no direct evidence of any signs visible to Ayala at the time he made the call. However, Ayala's counsel conceded that the jail "routinely monitor[s] phone calls" and did not challenge the court's assertion that the jail had posted signs notifying prisoners that their calls would be monitored. (R. 83, PID 446.) Ayala now appears to argue that such signs were posted in the housing area of the jail, but not in the booking area, and that the district court erred by not

inquiring into the area of the jail from which Ayala made the call. In support of this argument, Ayala cites *Hadley*, arguing that that case affirmed a "district court's decision to exclude calls made from the booking area of the jail, where inmates are not warned that calls are being recorded, as compared to the housing area, where inmates are warned that calls will be monitored." (Appellant Br. at 43 (citing *Hadley*, 431 F.3d at 489).) *Hadley* stands only for the unremarkable proposition that callers who have been told that their calls are being recorded are on notice that their calls are not confidential and private, while callers who have not been told are not on notice.

Although there is no evidence in the record concerning the signage in the section of the jail from which Ayala placed the call, this is due to defense counsel's failure to raise the issue. At the hearing on Ayala's motion in limine, defense counsel did not contest the court's assertion that Ayala's communications with his wife could not have been confidential because a "big sign" notified him that discussions were being recorded. (R. 83, PID 446.) True, the record does not contain evidence confirming that the sign was where Ayala could see it, but there is no evidence to the contrary and given counsel's responses, we are not left with "the definite and firm conviction that a mistake has been committed." *Ellis*, 497 F.3d at 611 (internal quotation mark and citation omitted).

### C. The Government Introduced Evidence Sufficient to Support Ayala's Convictions

Ayala next argues that the government failed to introduce evidence sufficient to support his convictions. He states that there "was no physical evidence at the scene" and "no physical evidence was recovered from either the pill bottles or the pills themselves." (Appellant Br. at 38–39.) Ayala also states that there were "no witnesses at the scene who could identify" him and that Palmer was the only witness to identify him as the person depicted in the surveillance footage. (*Id.* at 39.) Ayala also argues that, although the government introduced evidence that a cell phone belonging to Ayala was in the vicinity of the Rite Aid pharmacy at the time of the robbery, "there

was no evidence presented at trial actually placing that phone in Appellant's hand" and, although Palmer "testified that [Ayala] had been using the phone, [Ayala's] sister testified to the contrary." (*Id.*)

With respect to the controlled substances conviction, Ayala argues that "the drugs were found at the residence of Ms. Palmer, [Ayala] was not present." (*Id.*) Ayala also argues that none of his clothes were found at Palmer's residence and "there was no evidence presented at trial that he had any possessory interest in the residence." (*Id.*) Ayala also argues that Palmer's testimony that he planned to distribute the pills was implausible because Ayala "was scheduled to go to jail" for violations of the terms of his supervised release and, therefore, "would have had no opportunity to distribute any pills." (*Id.* at 39–40.) Finally, Ayala argues that Palmer's testimony was biased because "their marriage was already on the rocks" and "Palmer had every incentive to ensure that [he] was convicted of the crimes alleged, including exoneration of her own illegal conduct." (*Id.* at 40.)

"We will reverse a judgment for insufficiency of evidence only if, viewing the record as a whole, the judgment is not supported by substantial and competent evidence." *United States v. Taylor*, 800 F.3d 701, 711 (6th Cir. 2015) (alteration omitted) (quoting *United States v. Grubbs*, 506 F.3d 434, 438 (6th Cir. 2007)). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "Circumstantial evidence alone can meet this burden," *United States v. Washington*, 702 F.3d 886, 891 (6th Cir. 2012) (citing *United States v. Fekete*, 535 F.3d 471, 476 (6th Cir. 2008)), and all "reasonable inferences and resolutions of credibility are made in the jury's favor." *id.* (citing *United States v. Avery*, 128 F.3d 966, 971 (6th Cir. 1997)).

Pursuant to 18 U.S.C. § 2118(a)(1), whoever

> takes or attempts to take from the person or presence of another by force or violence or by intimidation any material or compound containing any quantity of a controlled substance belonging to or in the care, custody, control, or possession of a person registered with the Drug Enforcement Administration . . . shall . . . be fined under this title or imprisoned not more than twenty years, or both, if . . . the replacement cost of the material or compound to the registrant was not less than $500.

To sustain a conviction under § 2118(a)(1), the government was therefore required to prove (1) that Ayala took a quantity of pills containing hydrocodone—a controlled substance—from Rite Aid; (2) that such taking was accomplished by force, violence, or intimidation; (3) that the Rite Aid was registered with the Drug Enforcement Administration to dispense controlled substances at the time of the robbery; and (4) that the replacement cost of the stolen pills was $500 or more. The jury was properly instructed on these requirements and Ayala has raised no objection to the jury charge.

"To demonstrate possession with the intent to distribute a controlled substance under § 841(a)(1), the government must prove, beyond a reasonable doubt, that: (1) the defendant[] knowingly, (2) possessed a controlled substance, (3) with the intent to distribute." *United States v. Wettstain*, 618 F.3d 577, 585 (6th Cir. 2010) (citing *United States v. Coffee*, 434 F.3d 887, 897 (6th Cir. 2006)). The jury was properly instructed on these requirements and Ayala has raised no objection to the jury charge.

When viewed in the light most favorable to the government, the evidence was sufficient to allow a reasonable jury to convict Ayala on both charges. The jury heard evidence that a person armed with a firearm stole 4,007 hydrocodone pills with a replacement value of more than $3,000 from a Rite Aid pharmacy. The jury also heard that the perpetrator threatened the pharmacy's employees with violence if they did not comply with his demands and that the Rite Aid pharmacy was registered with the Drug Enforcement Administration. The jury saw surveillance photographs of portions of the robbery, and Palmer identified the perpetrator depicted in the footage and

photographs as Ayala. Palmer testified that she helped Ayala dispose of his firearm and the empty pill bottles, and the government introduced evidence corroborating Palmer's testimony including photographs depicting Ayala and Palmer at the locations she described and evidence that the police had recovered pill bottles originating at the Rite Aid pharmacy in the locations specified by Palmer. Palmer also testified that she had helped Ayala sort the pills and that Ayala had told her that he planned to sell the pills in a neighboring county. Finally, the government introduced evidence that Ayala's cell phone was in the vicinity of the Rite Aid pharmacy at the time of the robbery.

Ayala notes that portions of the testimony and evidence were contradicted by his sister's testimony. Estella testified that Ayala had been at her home taking care of her children at the time of the robbery, but admitted she had no direct knowledge of his presence because she was not there. Estella also testified that she had helped Ayala trim his beard the day before the robbery and, therefore, that Ayala could not have been the bearded perpetrator. But, contrary to Estella's testimony, Palmer testified that Ayala had a beard when she saw him after the robbery. Estella testified that Ayala used a different phone than the one described by Palmer, thus undermining the cell tower evidence. Estella further testified that she could not identify the perpetrator in the surveillance footage.

A reasonable jury could have disbelieved Estella's testimony and found that she was either mistaken or lying to protect her brother. This is an issue of witness credibility that falls squarely within the province of the jury as fact finder, and we cannot say that a reasonable juror could only believe Estella over Palmer, especially in light of the significant extrinsic evidence corroborating Palmer's testimony. Viewed in the light most favorable to the government, the evidence is sufficient to convict Ayala on both counts.

### D. Whether the Sentencing Court Properly Applied Firearm Enhancements Under the Guidelines

Finally, Ayala appeals the application of two Guidelines enhancements premised on his possession of a firearm. First, he challenges the application of a five-level enhancement to the robbery conviction because, pursuant to § 2B3.1(b)(2)(C), "a firearm was brandished or possessed" during the robbery. Second, Ayala challenges the application of a two-level enhancement to the controlled substance conviction because, pursuant to § 2D1.1(b)(1), "a dangerous weapon (including a firearm) was possessed" during that offense.

Ayala advances the same argument against both enhancements: that there was no evidence that the firearm "fit within the definition of 'firearm'" under the Guidelines. (Appellant Br. at 46.) Ayala also argues that "the testimony regarding the alleged firearm was on the whole contradictory" because a pharmacist testified that the firearm was dark gray, a police officer testified that the pharmacist had previously described the firearm as a black semi-automatic but also testified that he had not asked the witness whether the gun might have been a toy, and Palmer testified that the gun was a revolver. (*Id.* at 46-47.) On this point, Ayala misstates Palmer's testimony: Palmer in fact testified that the firearm was *not* a revolver.

The Guidelines define a firearm as:

(i) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive;

(ii) the frame or receiver of any such weapon;

(iii) any firearm muffler or silencer;

or (iv) any destructive device.

A weapon, commonly known as a "BB" or pellet gun, that uses air or carbon dioxide pressure to expel a projectile is a dangerous weapon but not a firearm.

U.S.S.G. § 1B1.1, Application Note 1(H). "A district court's determination that a defendant possessed a firearm during an offense 'is a factual finding subject to the clearly erroneous standard of review.'" *United States v. McCall*, 85 F.3d 1193, 1198 (6th Cir. 1996) (quoting *United States v. Duncan*, 918 F.2d 647, 650 (6th Cir. 1990)). In order to support a firearms enhancement, the government bears the burden of demonstrating that the defendant possessed a firearm by a preponderance of the evidence. *See United States v. Catalan*, 499 F.3d 604, 606 (6th Cir. 2007).

The district court did not clearly err in finding that Ayala had possessed a firearm during both offenses. With respect to the robbery charge, the surveillance footage and the victim testimony both indicate that Ayala possessed a dark-colored firearm. Palmer also testified that Ayala was carrying a firearm during the commission of the controlled substances offense. There was no evidence suggesting that the firearm might have been incapable of expelling a projectile, and Palmer's testimony that Ayala disposed of the firearm further supports the conclusion that it was, in fact, a real firearm.

The district court did not clearly err in its determination that the government had proven by a preponderance of the evidence that Ayala had carried a firearm as defined by the Guidelines.

### III. CONCLUSION

For the foregoing reasons, Ayala's convictions and sentence are **AFFIRMED**.