RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0070p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

No. 13-6125

CHRISTOPHER BRIAN EATON,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Kentucky at Bowling Green.
No. 1:12-cr-00011-1—Joseph H. McKinley, Jr., Chief District Judge.

Argued:  June 19, 2014

Decided and Filed:  April 20, 2015

Before:  SILER, CLAY, and GIBBONS, Circuit Judges.

───────────────

**COUNSEL**

**ARGUED:**  J. Guthrie True, TRUE GUARNIERI AYER, LLP, Frankfort, Kentucky, for Appellant.  Erin H. Flynn, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.  **ON BRIEF:**  J. Guthrie True, TRUE GUARNIERI AYER, LLP, Frankfort, Kentucky, for Appellant.  Erin H. Flynn, Mark L. Gross, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

───────────────

**OPINION**

───────────────

        CLAY, Circuit Judge.  Defendant and former Barren County Sheriff Christopher Eaton ("Defendant") was convicted of two counts of witness tampering in violation of 18 U.S.C. § 1512(b)(3) by a federal jury in the Western District of Kentucky for instructing two officers in

1

his command to give false statements in an investigation regarding the alleged excessive use of force against Billy Randall Stinnett on February 24, 2010.  Defendant appeals his conviction.  For the reasons stated below, we **AFFIRM**.

## BACKGROUND

### *Procedural History*

The second superseding indictment in this case, issued  on November 14, 2012, charged Defendant with eight counts related to excessive force, witness tampering, and obstruction of justice based on his conduct during the arrest of Billy Randall Stinnett and the subsequent federal investigation.  Deputies Aaron Bennett, Adam Minor, and Eric Guffey were also charged in the same indictment.  Defendant, Bennett, and Guffey were tried in a combined trial.  After nine days of trial and due deliberation, the jury returned a verdict of acquittal of all charges as to Bennett and Guffey.  Defendant was acquitted on all counts except two counts of witness tampering in violation of 18 U.S.C. § 1512(b)(3).  The district court subsequently denied Defendant's motion for a judgment of acquittal, and this timely appeal followed.

### *Factual History*

On February 24, 2010, Defendant and several of his deputies were involved in the arrest of Billy Randall Stinnett following an hour-long car chase that involved three different law enforcement agencies.  Stinnett crashed his van into a church in Glasgow, Kentucky and fled on foot into a blind alley next to the church.  Defendant chased after Stinnett and was the first to reach him in the alley.  Stinnett testified at trial that once he realized that his way out of the alley was blocked, he raised his hands behind his head and tried to get on his knees in an effort to surrender.  Defendant struck Stinnett over the head with his baton, drawing blood.  Stinnett fell to the ground, but Defendant continued to strike him.

Defendant was shortly followed by Deputy Eric Guffey, Deputy Aaron Bennett and Deputy Adam Minor.  Stinnett was placed in handcuffs while on the ground.  He testified that Defendant and the other deputies continued to strike him, punching him in the head and "all over." (R. 249, Transcript, PGID 2404.)  Stinnett acknowledged kicking Defendant with his steel-toed boots in an effort to stop the blows; in return, Defendant struck him on the back of his

legs with the baton.  Deputy Minor testified that he and Deputy Bennett arrived on the scene as Stinnett was being handcuffed.  Minor acknowledged kicking Stinnett twice, although Stinnett was handcuffed and was not resisting, and testified that Bennett punched Stinnett five to ten times hard in the head.  With the last punch, Bennett broke his hand.  Bennett then switched to using a baton, and Defendant approached and began striking Stinnett with his baton.

Minor eventually pulled Stinnett up and took him back towards the road.  Stinnett received more abuse during this walk, including a punch to the head from a special deputy by the name of Shannon White. Minor asked Stinnett if he had any weapons on him, and Stinnett answered that he had a pocket-knife in his pocket.  Minor testified that he had Stinnett sit down so that he could be searched, and that Defendant pulled a closed pocket knife from a visible clip in Stinnett's pocket.  The group continued walking.  In a moment allegedly captured by photo, Defendant struck Stinnett in the groin with his fist, causing Stinnett to lean over in pain.  (The photo, according to some witnesses, was later deleted at Defendant's request.)  Minor placed Stinnett into his vehicle and took him to the hospital to be treated for his injuries.

Three teenagers in the church witnessed the scene in the alley from a second story window.  Two of the teens would later report what they witnessed to their father, who in turn reported it to the Glasgow Police Department.  The Glasgow Police Department informed the FBI of the allegations, and the FBI launched an investigation.  FBI Agent Mike Brown interviewed Stinnett at the Berren County Jail on March 4, 2010 to learn his version of the arrest and document Stinnett's injuries.

On March 4, 2010, Brown also visited Defendant at the Sheriff's Office to inform him of the investigation and request evidence related to the arrest.  To Brown's surprise, Defendant responded that no use-of-force reports had been prepared.  Minor would later testify at trial that Defendant as a practice did not require his deputies to complete use-of-force reports because of Defendant's belief that "the more reports you write, the more you could get hemmed up."  (R. 210, Transcript, PGID 34.)  Brown asked Defendant to have the deputies involved in the incident draft reports to be turned over to the FBI.

Two deputies testified at trial that Defendant asked them to write false reports regarding the incident—Adam Minor, and another deputy named Steve Runyon, who had arrived on the

scene when Stinnett, already in handcuffs, was being walked to Minor's car.[1] Runyon and Defendant were long-time friends and colleagues; Defendant was grooming Runyon to replace him as Sheriff. Runyon testified that Defendant approached him at the gym on March 4, 2010. Defendant told Runyon about the FBI investigation into Stinnett's arrest. Runyon testified that Defendant told him that he needed Runyon to write a report stating that he saw a knife belonging to Stinnett at the arrest scene, although Defendant knew Runyon was not present in the alley and could not have seen any such knife. Runyon testified that when he resisted Defendant's request, protesting that he was not even familiar with the scene, Defendant drove him over to the alley where Stinnett was taken into custody to instruct Runyon on where he should say the knife was located.

Runyon testified that he felt nauseated by Defendant's efforts to persuade him to provide a false report. He was afraid to ask why Defendant needed him to write a report about the knife, and he was afraid that he would lose his job if he did not comply with the request. Runyon complied, writing falsely that he returned to the alley with Defendant and "[t]here was a gray metal type knife found lying on the ground which Stinnett claimed." (R. 211, Transcript, PGID 1756-57.) Runyon testified that Defendant told him what to write in the report, read it over when it was completed, and took it from Runyon to transmit to the FBI. Runyon also told the jury that in the following months Defendant conducted "a few closed-door meetings" with Runyon where Defendant would make comments about how Runyon had a good job, and it would be difficult for him if he lost it. (*Id.* at 1766.) Runyon said the meetings would generally end with his telling Defendant how much he appreciated his job "and a few times just begging him" to let Runyon stay until he reached retirement. (*Id.* at 1766-67.) Runyon was subpoenaed to testify before the grand jury in February 2011. At trial, Runyon testified that he gave false testimony before the grand jury when he told them that Defendant did not tell him what to include in his report; he did disclose to the grand jury, however, that he was not present when the knife was found. Runyon testified that after the indictments came out he was isolated in the department, excluded from operations and denied opportunities to work. He told the jury that no one spoke

---

[1]By the time of trial, Runyon had retired from the Sheriff's Department. We refer to him as a deputy in reference to his role at the time of the incident.

to him for months, and that Defendant once sent another deputy home as punishment for talking to Runyon.

Deputy Minor also testified that he wrote a false report about the incident at Defendant's direction. Minor received a call from a detective with the sheriff's office informing him of the FBI investigation and requesting that Minor complete a written report. Minor testified at trial that he wrote his report in Defendant's presence with Deputy Bennett. He described Defendant "walking around the office before we started writing the reports" and going over "this story line for us to write." (R. 209, Tr. at 1512.) Specifically, Defendant told them to state that Stinnett had "pulled a knife on [Defendant]," resisted arrest, and did not obey verbal commands. (*Id.*) Minor said as he was writing the story, Defendant continued walking around the office "going over that story again and again." (*Id.*) Minor testified that Defendant reviewed his completed report and instructed him to include additional information, including that once Stinnett was handcuffed the incident was over, and that Defendant showed Stinnett a knife and asked if it was his. Minor complied with Defendant's directions. Minor testified that the information Defendant told him to include in his report was false, and that he included it because he was afraid of losing his job if he refused the orders. Minor testified at trial that Defendant asked him to prepare a false report in order to "cover up what we had done" from "[t]he FBI." (R. 210, Transcript, PGID 1536-37.) Minor further testified at trial that he repeated the false information in a subsequent interview with FBI Agent Brown and in three different state court proceedings. Minor testified that he gave these false statements because Defendant told him to and because he was afraid he would be fired and unable to find another job in Barren County if he resisted.

## DISCUSSION

Defendant challenges his conviction on five grounds. First, Defendant asserts that the evidence was insufficient to support his conviction for witness tampering. He argues that this Court should read a materiality requirement into 18 U.S.C. § 1512(b)(3) and that we should on that basis conclude that the statements he procured regarding the knife did not "relat[e] to the commission or possible commission of a Federal offense" under the statute. Second, Defendant argues that the district court erred by failing to instruct the jury on the affirmative defense under § 1512(e). Third, Defendant asserts that the district court erred in failing to give a special

unanimity instruction. Because Defendant did not request either instruction at trial, we review the district court's failure to provide the instructions for plain error. Fourth, Defendant argues that the prosecutor made improper remarks in closing argument regarding Defendant's failure to testify. In the alternative, Defendant argues that his conviction should be reversed under a cumulative error standard. None of his arguments is availing.

## A. Sufficiency of the Evidence

### 1. Standard of Review

A Rule 29 motion for judgment of acquittal "is a challenge to the sufficiency of the evidence." *United States v. Jones*, 102 F.3d 804, 807 (6th Cir. 1996). This Court reviews challenges to the sufficiency of the evidence *de novo* to determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime." *Id.* On review, this Court "may not reweigh the evidence, reevaluate the credibility of witnesses, or substitute [its] judgment for that of the jury." *United States* v. *Mathis*, 738 F.3d 719, 735 (6th Cir. 2013).

### 2. Analysis

Defendant was convicted of two counts of violating 18 U.S.C. § 1512(b)(3). That statute provides, in pertinent part, that "[w]hoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, . . . with intent to . . . hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense," shall be fined or imprisoned, or both. § 1512(b)(3). In order to obtain a conviction under this subsection, the government must prove that the defendant (1) knowingly and willfully used intimidation, threatened, or corruptly persuaded another person, (2) with the intent to hinder, delay, or prevent the communication to a federal official, (3) of information "relating to the commission or possible commission of a Federal offense." *Id.*; *United States* v. *Carson*, 560 F.3d 566, 580 (6th Cir. 2009).

The trial record in this case contained abundant evidence that supported a finding that Defendant was guilty beyond a reasonable doubt of witness tampering based on his efforts to procure false reports from Deputy Runyon and Deputy Minor. Both Runyon and Minor testified

that Defendant pressured them to write false reports about the incident to be delivered to the FBI, using his position of authority to obtain compliance. Both men testified that they were not presented with a choice; rather, that Defendant instructed them on the precise false information they had to include in the report, that he read and approved their reports, and that they feared they would be fired if they did not make the statements he requested. Runyon described to the jury "closed-door" one-on-one meetings where Defendant threatened his job and Runyon begged to be allowed to stay until he reached retirement. This evidence was more than enough to support the verdict.

The principal thrust of Defendant's challenge to the sufficiency of the evidence on appeal is that both Runyon and Minor gave inconsistent testimony over time and that there was countervailing evidence in the record that could have allowed a jury to doubt the veracity of their statements. He asserts that the testimony of two "admitted perjurers" cannot support his conviction for witness tampering. This argument is without merit. The jury was entitled to believe the trial testimony of the two officers. It is not this Court's role to reweigh the evidence or to reevaluate the credibility of witnesses. *Mathis*, 738 F.3d at 735; *see also United States v. Beverly*, 369 F.3d 516, 532 (6th Cir. 2004) ("[D]etermining the credibility of witnesses is a task for the jury, not this [C]ourt."). And the fact that Runyon and Minor acknowledged perjuring themselves at Defendant's request can hardly be said to weigh objectively in Defendant's favor.

Defendant also argues that whether Stinnett had a knife in his hand when Defendant approached him is not "material to the federal offense" that was being investigated. Defendant contends that the witness tampering statute incorporates a materiality requirement by specifying that the crime involves hindering the communication of "information *relating to* the commission or possible commission of a Federal offense." § 1512(b)(3) (emphasis added). Defendant's theory is that the federal offense in question was alleged excessive force used against Stinnett after he was in handcuffs, and that the statements made by Minor and Runyon related to the knife could only be relevant to Defendant's use of force against Stinnett before he was handcuffed. Finding no precedent to support his interpretation of the statute, Defendant terms this a "novel" issue.

Defendant mistakes both the facts and the law. First, as the district court found, the federal investigation was not limited to allegations of excessive force after Stinnett was taken into custody. Agent Brown sought information from Defendant about the level of force that was used in effectuating the arrest, the reasons for the use of force, and the injuries Stinnett suffered—without any restriction to events occurring after Stinnett was handcuffed. Even at trial, the government presented evidence of excessive force prior to arrest, including Stinnett's testimony that Defendant attacked Stinnett as he was attempting to surrender by placing his hands behind his head and dropping to his knees.

The government's precise theory of excessive force during the investigation or prosecution, however, is beside the point. We decline Defendant's invitation to read a materiality requirement into § 1512(b)(3). The plain language of the statute applies to efforts to hinder the communication of information "relating to" the commission or possible commission of a federal crime.[2] Abstractly speaking, it is possible that some information may be so very attenuated from an alleged or suspected crime that efforts to prevent its communication would not support a conviction under § 1512(b)(3). For our purposes, it is plain that information "relates to" the commission or possible commission of a federal crime if it concerns the incident or occurrence in connection with which the crime may have occurred.[3] This interpretation is consistent with the purpose of § 1512(b)(3) to protect "the integrity" of even "*potential* federal investigations by ensuring that transfers of information to federal law enforcement officers and judges relating to the possible commission of federal offenses be truthful and unimpeded." *Carson*, 560 F.3d at 581 (quoting *United States v. Ronda*, 455 F.3d 1273, 1286 (11th Cir. 2006)). We would undercut that purpose if we required an inquiry into the legal significance of the information at issue in relation to the theory of criminal liability eventually developed in the course of an investigation.

---

[2]Defendant cites to a passage in *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005) that he believes supports his reading of the statute by its use, in passing, of the term "material." In context, it is clear that the Court was addressing the *mens rea* requirement, applicable to a different statutory provision at issue there, that the defendant have knowledge of the relevance of the document to a foreseeable official proceeding; the case did not purport to impose a materiality requirement on the document itself. *See id.* at 708. Defendant's citation is even less persuasive in light of this Court's previous holding that the provision at issue in this case, § 1512(b)(3), does not require proof of a nexus with a particular federal investigation. *United States v. Carson*, 560 F.3d 566, 581-82 (6th Cir. 2009).

[3]We do not mean to limit application of the phrase "relating to" to these factual circumstances. Whatever the extent of the reach of § 1512(b)(3), it is clear that the information at issue in this case falls within it.

Here, Defendant sought to present to the FBI a false "story line" about the physical confrontation with Stinnett by requiring Minor to report untruthfully that Stinnett threatened Defendant with a knife, resisted arrest, and refused to obey verbal orders, and by requiring Runyon to corroborate that story by reporting that they found a knife on the ground at the scene of the arrest. Defendant's efforts prevented the officers from communicating to the FBI the manner in which the incident actually occurred, including the fact that the knife was found, closed, in Stinnett's pocket well after he was handcuffed. Plainly, this was information "relating to" the commission or possible commission of a federal crime in that it pertained to the incident involving the alleged excessive use of force in violation of Stinnett's civil rights.

In sum, the evidence presented at trial was sufficient to support Defendant's conviction. This Court will neither reevaluate the witnesses' credibility nor graft a heightened materiality requirement onto § 1512(b)(3).

**B. Failure to Instruct the Jury on the Affirmative Defense in § 1512(e)**

Defendant next argues that, although he did not request such an instruction, the district court committed reversible error in failing to instruct the jury on the affirmative defense provided in § 1512(e) that precludes criminal liability where the alleged conduct is otherwise lawful and the defendant's "sole intention was to encourage, induce, or cause the other person to testify truthfully." We disagree.

**1. Standard of Review**

In a typical challenge to a district court's jury instructions, this Court applies an abuse-of-discretion standard. *United States v. Williams*, 612 F.3d 500, 506 (6th Cir. 2010). Under this standard, we "review the instructions as a whole, in order to determine whether they adequately informed the jury of the relevant considerations and provided a basis in law for aiding the jury in reaching its decision." *United States v. Kuehne*, 547 F.3d 667, 679 (6th Cir. 2008) (quoting *United States v. Frederick*, 406 F.3d 754, 761 (6th Cir. 2005)). When a defendant fails to request a particular jury instruction, "we review the district court's jury instructions, as a whole, for plain error." *United States v. Stewart*, 729 F.3d 517, 530 (6th Cir. 2013). This standard poses the inquiry of "whether the instructions, when taken as a whole, were so clearly wrong as

to produce a grave miscarriage of justice." *United States v. Miller*, 734 F.3d 530, 538 (6th Cir. 2013) (internal quotation marks omitted).

### 2. Analysis

Defendant raised the issue of a § 1512(e) defense for the first time in his post-trial brief. Under that subsection, in a prosecution for witness tampering,

> [I]t is an affirmative defense, as to which the defendant has the burden of proof by a preponderance of the evidence, that the conduct consisted solely of lawful conduct and that the defendant's sole intention was to encourage, induce, or cause the other person to testify truthfully.

§ 1512(e). Defendant argues that the jury's acquittal on the excessive force charges "strongly suggests, in retrospect, that the jury believed that if Eaton made *any* comment to the deputies about information to be included in their reports then he must be guilty of witness tampering." Def.'s Br. at 40. Yet the district court's instructions on the elements of witness tampering already served to prevent any confusion on that score by explaining that to return a guilty verdict on the charge the jury must find that he "hindered, delayed, or prevented" the communication of information to a relevant law enforcement officer. Nor are the verdicts necessarily inconsistent. The jury may have entertained doubts about whether the force used was excessive and nonetheless credited the testimony of Minor and Runyon as establishing beyond a reasonable doubt that Defendant required them to write false reports in order to bolster his case that force was necessary.

Moreover, as the district court found, Defendant presented no evidence at trial that would support the affirmative defense, nor did he direct the district court to evidence that would substantiate the claim. *See Smith v. United States*, 133 S. Ct. 714, 720 (2013) (a criminal defendant may support an affirmative defense by submitting evidence or testimony of the underlying facts or by "direct[ing] the court to other evidence substantiating his claim."). On appeal, Defendant identifies two sources of evidence he contends support a finding that he merely sought to encourage Minor and Runyon to give truthful statements: the fact that none of the other officers testified that Eaton tried to improperly influence their reports; and the fact that Minor and Runyon were "admitted perjurers." At best, this evidence only weakly supports a conclusion that Defendant was merely encouraging the two officers to tell the truth about the

knife.  Such weak evidence cannot compel a conclusion that by failing to *sua sponte* instruct the jurors on an affirmative defense that Defendant had not previously raised, the district court's instructions constituted an abuse of discretion, much less a "miscarriage of justice."  *Miller*, 734 F.3d at 538.

**C. Failure to Provide a Special Unanimity Instruction as to Count 5**

Defendant also faults the district court for not providing a "special unanimity instruction" with regard to Count 5; that is, he argues that the court should have instructed the jury that its decision must be unanimous as to what information Defendant directed Minor to suppress. Under Count 5, the jury could have convicted Defendant on finding either (1) that he sought to require Minor to conceal the unreasonable force used against Stinnett; or (2) that Defendant sought to require Minor to provide false information about the knife.  Because Defendant did not raise this objection at trial, we review the district court's instructions in this regard for plain error under the standard described above.  *See also United States v. Kakos*, 483 F.3d 441, 445 (6th Cir. 2007) (plain error review applies to failure to provide special unanimity instruction where the defendant did not object at trial) (collecting cases).

A special unanimity instruction is a means of clarifying a so-called "duplicitous" charge, or one that "'sets forth separate and distinct crimes in one count.'"  *Kakos*, 483 F.3d at 443 (quoting *United States v. Davis*, 306 F.3d 398, 415 (6th Cir. 2002)).  A duplicitous charge carries the risk that a criminal defendant "may be deprived of his right to a unanimous jury verdict" if individual jurors find him guilty of different crimes.[4]  *Id.*  However, a charge that permits more than one factual basis for conviction "'does not automatically require a unanimity instruction.'" *United States v. Algee*, 599 F.3d 506, 514 (6th Cir. 2010) (quoting *United States v. Krimsky*, 230 F.3d 855, 860 (6th Cir. 2000)).

The Supreme Court has explained that while "a jury in a federal criminal case cannot convict unless it unanimously finds that the Government has proved each element," nonetheless the jury "need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element."  *Richardson v. United States*, 526 U.S. 813, 817 (1999).

---

[4]Duplicitous charges may also prejudice defendants in other ways not at issue on this appeal.  *See generally Kakos*, 483 F.3d at 443-44.

The pivotal distinction made by the Court differentiated between elements, which the jury must unanimously agree to have been proven, and the "means" or "brute facts" constituting an element, as to which unanimity is typically not required. *Id.* at 817-19; *see also United States v. DeJohn*, 368 F.3d 533, 540-41 (6th Cir. 2004) (discussing *Richardson*). The Court cautioned, however, that the Constitution itself may limit instances in which a crime could be defined "in ways that would permit juries to convict while disagreeing about means, at least where that definition risks serious unfairness and lacks support in history or tradition." 526 U.S. at 820. Under *Richardson*, in determining whether unanimity is required, we look to "the language of the statute, tradition, and the breadth of the statute (which 'aggravates the dangers of unfairness' . . . ), and to the desirability of avoiding having to decide the constitutional questions surrounding a definition of a crime that allows significant jury disagreement as to means." *DeJohn*, 368 F.3d at 540 (citing *Richardson*, 526 U.S. at 819).

In this case, Defendant's argument relates to the character of the information that was concealed by Minor. He asserts because there are two factual issues—the force used against Stinnett, and whether Stinnett pulled a knife on Defendant—the charge must be duplicitous. We think it clear that this distinction goes to the "brute facts" underlying the third element of witness tampering under § 1512(b)(3), *i.e.*, the "information relating to the commission or possible commission of a Federal offense." The statute makes no distinction between discrete factual assertions or statements constituting the information at issue. Indeed, the term "information" in its natural use often encompasses multiple facts or items of knowledge. Similarly, in a case concerning the analogous crime of obstructing a federal investigation by falsifying records in violation of § 1519, this Court held that multiple alleged false statements in a report about use of force against a prisoner did not create a concern of unconstitutional duplicity because the charge that the defendant "falsified a document" addressed the document as a whole rather than portions of the document. *United States v. Schmeltz*, 667 F.3d 685, 687-88 (6th Cir. 2011). The same analysis applies here—the charge of hindering the communication of information about the incident to a federal law enforcement officer encompassed both the issue of the knife and the details about the extent of force used against Stinnett. Jurors could vote to convict Defendant based on his efforts to prevent the communication of either piece of information, or both.

Defendant does not raise any concern of constitutional magnitude about a risk of "serious unfairness" arising from the nature of his charge. *Richardson*, 526 U.S. at 820. Although the term "information" in § 1512(b)(3) renders the provision somewhat broad, both the conduct and information at issue in Defendant's charge are sufficiently related and specific that we need not be concerned that fundamental fairness was put at risk in this case. *See id.* (citing *Schad v. Arizona,* 501 U.S. 624, 632-33 (1991) (plurality opinion) and 501 U.S. at 651 (Scalia, J., concurring) ("We would not permit . . . an indictment charging that the defendant assaulted either X on Tuesday or Y on Wednesday[.]")).

### D. Prosecutorial Misconduct

#### 1. Standard of Review

Whether certain comments made by a prosecutor amount to prosecutorial misconduct and whether those comments rendered the trial fundamentally unfair are mixed questions of law and fact, which this Court considers *de novo*. *United States v. Gardiner*, 463 F.3d 445, 459 (6th Cir. 2006).

#### 2. Analysis

In the Sixth Circuit, we apply a two-step analysis to determine if alleged prosecutorial misconduct requires reversal. First, we determine whether prosecutorial statements allegedly constituting misconduct were improper. *Kuehne*, 547 F.3d at 687. Next, if we find impropriety, we "then determine whether the improprieties were flagrant such that a reversal is warranted." *Id.* at 687-88. Under this second prong of the analysis, we consider four factors: "'1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; 2) whether the conduct or remarks were isolated or extensive; 3) whether the remarks were deliberately or accidentally made; and 4) whether the evidence against the defendant was strong.'" *Id.* (quoting *United States v. Modena*, 302 F.3d 626, 635 (6th Cir. 2002)). This analysis examines challenged statements by the prosecutor "within the context of the trial to determine whether such comments amounted to prejudicial error." *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001) (citing *United States v. Young*, 470 U.S. 1, 11-12 (1985)).

Defendant argues that remarks by the prosecutor in closing constituted a comment on his decision not to testify. The remarks at issue were made during the rebuttal in reference to the testimony of defense expert Alex Payne, who testified to the kinds of force that might be appropriate if Stinnett was resisting arrest. The prosecutor argued,

> But you got to ask yourself why are the defendants asking him if the force defendants used was justified if none of the defendants said they used any force on him? They asked him several questions about whether or not they could use knee strikes to knee him in the sides and in the legs, whether or not they can apply pressure to the back of his head to drive his head into the ground and whether or not those types of strikes, which would be justified, would cause injuries consistent with what the pictures showed Stinnett suffered. But you got to ask yourself why are they asking him those questions *if none of them came forward and said that's what they actually did*? There's been no evidence that they were delivering knee strikes to him to get him to comply so they could put handcuffs on him. There's been no evidence that they that were driving their hands or their fingers into the back of his head so that they could press his head to the ground so that they could get handcuffs on him, there's been no evidence of that so why are they asking their use of force expert these questions?

(R. 254, Transcript, PGID 3163 (emphasis added).) Defense counsel objected and a bench conference was held. The prosecutor clarified that he was referring to the defendants' "statements that came in through their reports." (*Id.* at 3164.) The district court accepted this explanation and overruled the objection, though warning the prosecutor that "it was really close." (*Id.*) When the prosecutor returned to his argument he clarified for the jury that the statements he was referring to were "what they reported in their reports" because "all we know what the defendants have said about what happened to the victim comes through their written reports." (*Id.* at 3165.) Defense counsel again objected, and the district court overruled the objection on the basis that the comment was a useful clarification of the earlier statement. (*Id.* at 3165-66.) Defendant raised the issue in post-trial briefing. The district court assumed *arguendo* that the comments were improper, but determined that they did not meet the standard for flagrancy.

In context, it appears that the prosecutor was commenting on defendants' version of the incident as stated in their reports. Assuming *arguendo* that the jury would nonetheless have construed the remarks as reflecting on Defendant's failure to testify, *see United States v. Wells*, 623 F.3d 332, 339 (6th Cir. 2010), we agree with the district court that reversal is not warranted under the four factor test for flagrancy. The evidence against Defendant on the witness

tampering charges was very strong. Any prejudice or misleading effect from the remarks was limited both by the prosecutor's clarification that his comments pertained only to the statements made in the reports, which were part of the record, and by the district court's instructions that Defendant had an absolute right to remain silent and that his silence could not be used against him. We decline to reverse on these grounds.

### E. Cumulative Error

A cumulative error claim alleges a violation of a defendant's due process right to a fair trial. *United States v. Blackwell*, 459 F.3d 739, 770 (6th Cir. 2006). Defendant argues that even if reversal is not required by any single trial error, he is entitled to a new trial because the cumulative effect of the alleged errors constitutes a due process violation. To succeed under such a theory, Defendant "'must show that the combined effect of individually harmless errors was so prejudicial as to render [the] trial fundamentally unfair." *United States v. Adams*, 722 F.3d 788, 832 (6th Cir. 2013) (quoting *United States v. Trujillo*, 376 F.3d 593, 614 (6th Cir. 2004)).

Because we find no error with respect to the jury instructions, the only potential error remaining is the possibility that the prosecutor's remarks were improper. As discussed above, we conclude that those comments do not warrant reversal. Because Defendant does not establish any additional error that could compound the prejudice, he cannot succeed on his cumulative error claim.

### CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.