NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0387n.06

No. 24-5681

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Aug 05, 2025
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE |
| v. | ) ) | |
| MARCHELLO MOORE, | ) ) | |
| Defendant-Appellant. | ) ) | OPINION |
|  | ) ) | |

Before: BATCHELDER, CLAY, and BLOOMEKATZ, Circuit Judges.

**CLAY, Circuit Judge.** After a six-day jury trial, Defendant Marchello Moore was convicted of one count of attempted Hobbs Act robbery, in violation of 18 U.S.C. § 1951, eight counts of Hobbs Act robbery, in violation of 18 U.S.C. § 1951, and eight counts of using a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c). Following the jury's verdict, Moore twice moved unsuccessfully for a new trial. The district court subsequently sentenced Moore to 210 years of imprisonment and five years of supervised release for the offenses contained in the jury's verdict as well as for Moore's earlier conviction for escape, in violation of 18 U.S.C. § 751. On appeal, Moore argues that the district court violated his right to a fair trial by opining from the bench during witnesses' testimony and instructing the jury to not consider his courtroom appearance. Moore also challenges several of the district court's evidentiary rulings and asserts that he is entitled to a new trial due to the district court's cumulative errors. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.   BACKGROUND

Moore's conviction for the above-referenced offenses followed an investigation by the Memphis Police Department ("MPD") into a string of robberies in the Memphis, Tennessee metropolitan area.

### A.  Factual Background

Moore was charged with offenses stemming from ten robberies and one attempted robbery. The first robbery took place at a Circle K convenience store in the early hours of July 26, 2022, when a masked individual flashed a gun inside the store, compelling the cashier to empty the contents of her till.  Later that day, a man with a gun robbed a nearby Subway store.  Next, on August 27, 2022, a man robbed a second Subway store after brandishing a gun.  Four days later, on August 31, 2022, a man with a gun robbed a Half Off Shoes store.  Four days after the robbery at Half Off Shoes, a masked man entered the same Circle K convenience store, brandished a gun, and directed the cashier to hand him money from the cash register.  Approximately ten hours later, a masked man with a gun robbed a nearby Dollar Tree.  Later that week, on September 10, 2022, a masked man with a gun robbed a Mapco store.  Two days later, on September 12, 2022, a masked man robbed another Circle K convenience store.  Four hours after that robbery, a masked man robbed another Mapco store while apparently wearing the same outfit from the earlier Circle K robbery.  The tenth and final robbery took place two days later at a Family Dollar store.

Security footage from the two Subway robberies, the fifth and eighth robberies at the Circle K stores, the sixth robbery at the Dollar Tree, and the seventh and ninth robberies at the Mapco stores, captured images of a black Chevrolet Impala with silver rims parked in the parking lots outside the businesses at the time of the robberies.  In addition, security video footage from the first Circle K store and a store next to the Half Off Shoes store captured images of a gray or silver

Toyota Camry outside the stores at the time of the respective robberies.  As further explained

below, MPD detectives used a regional network of cameras to identify the license plate numbers

of the Camry and Impala and thereafter located both vehicles in the same driveway.  The MPD

eventually secured warrants to attach tracking devices to both vehicles.  The officers began using

a tracking device to surveil the movements of the Impala, which they followed to a Circle K store

on the evening of September 15, 2022.  There, officers witnessed Moore exiting the store.  After

proceeding into the Circle K, the officers were informed by the store clerk that an individual had

just attempted to rob the store.  Officers then relocated the Impala outside the Circle K, began

pursuit, and eventually arrested Moore.

## B. Procedural History

### Indictment and Pretrial Motions

On January 26, 2023, a federal grand jury in the Western District of Tennessee returned a

twenty-two-count indictment charging Moore with ten counts of Hobbs Act robbery (Counts 2, 4,

6, 8, 10, 12, 14, 16, 18, and 20), one count of attempted Hobbs Act robbery (Count 22), ten counts

of using a firearm in a crime of violence (Counts 3, 5, 7, 9, 11, 13, 15, 17, 19, and 21), and one

count of escaping federal custody (Count 1).[1]

Approximately two months later, on March 24, 2023, Moore moved pursuant to Federal

Rule of Criminal Procedure 12(b)(3) to suppress evidence gathered by law enforcement officers

during his arrest and the subsequent search of his residence.  On May 3, 2023, Moore filed a

supplemental motion to suppress, arguing that all evidence recovered following the search of the

---

[1] The escape charge followed Moore's unauthorized departure from a halfway house where he was ordered confined following his conviction on federal charges unrelated to the convictions pertinent to this appeal.  Pursuant to a plea agreement, Moore pleaded guilty to the escape charge on January 26, 2024.  Moore does not challenge his escape conviction on appeal.

Impala should be suppressed due to a defective affidavit in support of the Impala search warrant. After conducting an evidentiary hearing on Moore's motions, a magistrate judge issued a report and recommendation ("R. & R.") recommending that the district court deny Moore's motions to suppress. After Moore filed an objection, on July 27, 2023, the district court issued an order adopting the R. & R. and denying Moore's motions to suppress.

Following their disclosure of proposed expert testimony, the government and Moore filed dueling motions to exclude each other's experts from testifying at trial. The government moved to exclude the testimony of proposed expert David Burgess, whom Moore intended to call for testimony concerning cell site data analysis. After holding an evidentiary hearing pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the district court issued an order granting the government's motion to exclude Burgess' testimony because it concluded that Burgess lacked relevant training, experience, and specialized knowledge concerning cell site data.

**Trial and Post-trial Motions**

Moore's trial commenced on January 29, 2024, and concluded on February 5, 2024. During the trial, the government presented testimony from various fact and expert witnesses. Among the witnesses presented by the government were Yolanda Ramirez, Rickey Dugger, Charita Travis, and Kyle Vlastos. Ramirez testified that she witnessed the robbery of Half Off Shoes; Dugger, an MPD investigator, testified concerning his surveillance of Moore during the evening of the final attempted Circle K robbery; Travis, a detective with the Shelby County Sheriff's Office, described the process for collecting inmates' jail calls for investigations; and Vlastos, an MPD detective, testified about his investigation into the cars driven by the robbery suspect.

The jury ultimately returned a verdict convicting Moore of Counts 2, 3, 6–19, and 22, and acquitting him of Counts 4 and 5.[2] Moore moved for a new trial on February 19, 2024, arguing that evidence produced during his trial was insufficient to support the jury's verdict. Following the government's response in opposition, the district court denied Moore's motion in a written order issued on June 3, 2024. On July 12, 2024, Moore moved, pursuant to Rule 33(b)(1) of the Federal Rules of Criminal Procedure, to vacate the jury's verdict. On July 16, 2024, the district court denied Moore's second motion. The following day, on July 17, 2024, the district court conducted a sentencing hearing for Moore. During the hearing, the district court sentenced Moore to 210 years in prison and five years of supervised release.

Moore filed a timely notice of appeal on July 31, 2024.

## II. DISCUSSION

In support of his request for a new trial, Moore advances six principal arguments on appeal. Moore argues that the district court committed reversible error by (1) instructing the jury not to consider his physical appearance; (2) improperly interjecting during the testimony of three witnesses; (3) excluding Burgess' expert witness testimony; (4) permitting the government to introduce records of Moore's jail telephone calls; and (5) permitting the government to introduce unverified images utilized during the robbery investigation. In addition, Moore argues that the district court's cumulative errors rendered his trial unfair in violation of the Sixth Amendment.

We address each argument in turn.

---

[2] The jury did not return a verdict on Counts 20 and 21. The district court dismissed those charges on March 15, 2024.

## A. District Court Conduct

Moore argues that the district court's trial conduct violated his rights under the Sixth Amendment to the United States Constitution, which guarantees individuals the right to a fair trial. *See United States v. Ford*, 830 F.2d 596, 600 (6th Cir. 1987). In particular, Moore contends that the district court's conduct during closing arguments and the testimonies of Ramirez, Dugger, and Travis rendered his trial constitutionally defective.

### Standard of Review

Because Moore did not object to this conduct during the trial, our review is limited to plain error. *United States v. Ross*, 703 F.3d 856, 878 (6th Cir. 2012). "To establish plain error, a defendant must show that: (1) an error occurred in the district court; (2) the error was obvious or clear; (3) the error affected defendant's substantial rights; and (4) this adverse impact seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Emuegbunam*, 268 F.3d 377, 406 (6th Cir. 2001). At bottom, this inquiry concerns whether the district court's conduct prejudiced Moore such that he was denied a fair trial. *See United States v. Lewis*, 338 F.2d 137, 140 (6th Cir. 1964). With that understanding in mind, we now turn to the district court's challenged conduct.

### Background

*Closing Arguments*. Moore has multiple tattoos, including letters tattooed on his left arm and a cross tattooed on his right arm.[3] During closing arguments, defense counsel drew the jury's attention to witness testimony and trial exhibits concerning both of Moore's tattoos and the

---

[3] According to a report prepared by the probation department in advance of Moore's sentencing, Moore covered these two tattoos with additional tattoos at some point during his incarceration. While it is unclear from the record whether these specific tattoos were visible on his arms during closing arguments in this trial, all parties agree that Moore had visible tattoos on his forearms.

purported tattoos of the robbery suspect. Prior to closing arguments, the jury heard testimony from multiple witnesses concerning the presence or lack thereof of visible tattoos on the robbery suspect. For example, MPD Lieutenant Thomas Walters, who investigated the robberies, testified that a picture of Moore in handcuffs following his arrest showed that Moore had tattoos on his forearms. Moore's romantic partner at the time of his arrest also testified that Moore had multiple tattoos on his arms. Focusing on that testimony during closing arguments, defense counsel sought to emphasize the imperceptibility of tattoos on the arms of the robbery suspect in recorded video footage. After defense counsel displayed and began discussing a still image of the perpetrator from security camera footage of one of the robberies, the district court called Moore's counsel and the government to a sidebar. During the sidebar, the district court remarked that Moore had "just pulled his sleeve up to show the jury his tattoos at a certain point." Trial Tr., R. 231, Page ID #3352. This action concerned the district court because it did not consider Moore's actions at the defense table to constitute permissible evidence. Moore's counsel agreed that Moore's actions during closing argument were "not evidence in the case," but noted that "the jury is allowed to look at him." *Id.* The district court then ended the sidebar and gave the following instruction to the jury:

> THE COURT: We were just going over the fact that in order to be evidence in the case, it has to come in from the witness stand and be subject to cross-examination. And so anything that you see outside of that is not evidence in the case. And so if anyone was to attempt to display something that is not subject to cross-examination from the witness stand, it's simply not evidence. It can't be. It's—that is not allowed in the proceedings. So just be mindful of that, and you have to only consider the evidence that's been admitted through the witness stand and through the witnesses who have provided testimony. Thank you.

*Id.* at Page ID #3353.  Defense counsel then resumed her closing arguments and again noted that an image from footage of one robbery did not show a perpetrator with tattoos and that a witness to another robbery did not recall the perpetrator having visible tattoos.

***Yolanda Ramirez.***  Prior to closing arguments, the district court made several comments during the testimony of Yolanda Ramirez, who described witnessing the robbery of Half Off Shoes.  Before Ramirez began testifying, the district court had a brief exchange with Ramirez's courtroom interpreter before instructing the jury on how to assess Ramirez's testimony:

> THE COURT:  In this situation, we will have an interpreter, and so we're going to let them get started so that—are we set up for interpreting right now?
>
> THE INTERPETER:  Yes, Your Honor.
>
> THE COURT:  Okay.  And we—have to translate everything I say.
>
> THE INTERPETER: Yes.
>
> THE COURT: Okay.  That is perfectly normal, and we cannot disregard something because there's an interpreter.  We can't give it extra credit, either.  It's like anybody else speaking, but the interpreter is necessary so that you'll be able to understand the answers and—unless all of you speak that particular language, which I think is going to be Spanish.  So you should not give it any special weight or any less weight than the testimony of any other witness.
>
> And interpreters are certified so that the court reporter—a court interpreter in the United States District Courts is required to pass an extensive test so that they accurately interpret both the question to the witness and so that they accurately interpret the answer of the witness.  It's a significant process . . . .

Trial Tr., R. 224, Page ID #2348–49.  Ramirez then began testifying about the Half Off Shoes robbery.  At one point during her testimony, the district court interjected to clarify the government's question concerning Ramirez's location during the robbery.  *See* Trial Tr., R. 228,

Page ID #2742 ("THE COURT: I think she's asking where are you in the store even if we can't

see you?"). Later, during her cross-examination, while defense counsel questioned Ramirez about

a police officer's suspect-identification process, the district court interjected again:

> THE COURT: Let me ask one question. Was the officer asking you questions in English or in Spanish?
>
> THE WITNESS: In English. But she utilized a translator, a translator.
>
> THE COURT: She asked the questions, and there was somebody, hopefully, translating, right?
>
> THE WITNESS: She was doing it through the telephone.
>
> THE COURT: It was a telephonic translation; is that right?
>
> THE INTERPRETER: Your Honor, the interpreter needs to clarify. Through the phone, in the phone unit.
>
> THE WITNESS: Yes.
>
> THE COURT: Okay. We just needed to clear that up because we need to know.

*Id.* at Page ID #2748. Moments later, the district court interrupted defense counsel's cross-

examination again to clarify whether Ramirez's interpreter during her police interview utilized

language translation software. *See id.* at Page ID #2749 ("THE COURT: Not a real person but a

computer?"). Next, the district court interrupted the cross-examination a third time to determine

whether a federal or state officer conducted the suspect identification portion of Ramirez's police

interview. The district court then convened a sidebar to inquire further into the identity of the

officer. During the sidebar, the district court expressed its concern that the officer's professional

affiliation was unclear, and that computer software was used to conduct the translation for

Ramirez's police interview. *See id.* at Page ID #2750 ("THE COURT: I'm just shocked that you

used an app. Who did this?"); *id.* at Page ID #2752 ("THE COURT: I think this is confusing, and

we need to get unconfused."). Following the sidebar, the district court informed the jury that "we were trying to straighten out some confusion." *Id.* at Page ID #2756. The government then clarified to the court that the officer who conducted Ramirez's interview following the robbery was a member of a federal taskforce who was employed by the MPD. After cross-examination resumed, the district court interjected once more to probe Ramirez's English language proficiency, birth country, and actions during her police interview.

> THE COURT: Did you actually take a pen and draw a circle around anything, or did you tell someone something? And if you don't remember, tell me. But—are you doing okay today? Let me ask that. How are you doing?
>
> THE WITNESS: Yes.
>
> THE COURT: You're doing okay today?
>
> THE WITNESS: Yes.
>
> THE COURT: Okay. Now, I'm going to ask you a question to help all of us understand. And that is: How much English do you speak? Because she was speaking in English that day. Not very much, a little bit, a whole lot? Tell us.
>
> THE WITNESS: Yes, I do speak some English.
>
> THE COURT: Okay. Some words in English are different from words in Spanish, right?
>
> THE WITNESS: Yes.
>
> THE COURT: Okay. Now, [defense counsel] has some questions for you. But we want to be—we want to understand not what you— what might have happened, but what you actually remember did happen because he's asking about the photographic lineup. Is that okay?
>
> THE WITNESS: Yes.
>
> THE COURT: And do you understand you're in a United States court, so you're not going to get in any trouble? Just tell us the truth. Is that okay?

THE WITNESS:  Yes.

THE COURT:  Okay.  I am going to ask one question because the jury is just dying to know this.  What is your native country?

THE WITNESS:  Guatemala.

THE COURT:  I am going to ask where in Guatemala?

THE WITNESS:  San Marcos.

THE COURT:  Okay.  Do you want to tell me where San Marcos is?

THE WITNESS:  Where San Marcos is located?  It is a state.

THE COURT:  Right.  And San Marcos is—how far from Guatemala City is it?

THE WITNESS:  Around five or six hours.

THE COURT:  Right.  And that just helps us get a little background. Okay.  I think we're all set.

*Id.* at Page ID #2759–60.  The district court interjected during Ramirez's testimony one final time during the government's redirect to clarify for the jury that Ramirez had been interviewed by an MPD officer using a language translation app.  *See id.* at Page ID #2767 ("THE COURT:  And it's important for everybody to understand that it was an app, and I think everybody understands that. Okay.  And it's a far cry from a live translator on the phone.  Everybody has got that.  We're good.").

*Rickey Dugger.*    The district court interjected again during Dugger's testimony the following day.  While being cross-examined, Dugger admitted that he could not recall what color pants the suspect in the final Circle K robbery had been wearing.  The district court then interrupted to clarify Dugger's recollection.

> THE COURT: Would somebody please clear up the lighting there?
>
> Remind us that—either one of you—but exact time or day the observations were being made and then the lighting. Does that make sense? We just need to understand. I'll do it, if you want me to. You rather me do it?

Trial Tr., R. 225, Page ID #2511–12. After the district court's prodding, defense counsel asked Dugger to explain the lighting at the time he viewed the Circle K suspect and the timing of his supplemental police report which described the suspect's clothing.

***Charita Travis.*** Travis' testimony concerned the Shelby County Sheriff's Office's procedures for retrieving recordings of county inmates' phone calls. During her cross-examination, defense counsel began questioning Travis about the potential for manipulation of jailhouse telephone call recordings and the alternative methods inmates could use to make calls from the county jail. The district then called a sidebar, during which the government objected to the defense's questioning for purportedly lacking relevance and confusing the issues. Following the government's objection, the district court compared the Sheriff's Office's phone recording process to that of major mobile phone networks before questioning the relevance of defense counsel's line of questioning.

**Analysis**

After careful review of the above statements, we find no plain error in the district court's conduct challenged by Moore on appeal. As an initial matter, we reject Moore's contention that the district court improperly instructed the jury not to consider as evidence his movements revealing his forearm tattoos during closing arguments. Our conclusion in this regard is particularly informed by the timing of Moore's actions, as we have frequently reminded parties that "an attorney's closing argument is not evidence." *United States v. Wilson*, 168 F.3d 916, 924 n.6 (6th Cir. 1999). The district court properly applied this principle to Moore's movements during

defense counsel's closing arguments. Given defense counsel's prompt agreement with the district court's decision in this regard, *see* Trial Tr., R. 231, Page ID #3352 ("It's not evidence in the case. Nobody is disputing that."), we find no reason to conclude that the district court's instruction concerning Moore's actions was plain error. Furthermore, we have long recognized that "district courts are vested with power to control their courtrooms." *United States v. Meacham*, 65 F. App'x 529, 533 (6th Cir. 2003). That power necessarily encompasses the inherent authority to maintain decorum within the courtroom. *See In re Smothers*, 322 F.3d 438, 442 (6th Cir. 2003). By promptly instructing the jury as to how they should weigh Moore's movements during closing argument, the district court properly exercised that authority.

We similarly reject Moore's challenge with respect to the district court's statements and questions during the witness testimony outlined above. During trial, district court judges may "intercede in the questioning of a witness" due to the "seeming inadequacy of examination or cross-examination by counsel, or to draw more information from reluctant witnesses or experts who are inarticulate or less than candid." *United States v. Smith*, 561 F.2d 8, 14 (6th Cir. 1977) (quoting *United States v. Burch*, 471 F.2d 1314, 1317 (6th Cir. 1973)). However, "[t]he right of a trial judge to interrogate witnesses and comment on the evidence is not unlimited." *Lewis*, 338 F.2d at 140. To that end, we generally "disapprove[] of extensive questioning of witnesses by a trial judge" because such intrusions may cause "the appearance of partiality . . . if the judge intervenes continually on the side of one of the parties." *United States v. Hickman*, 592 F.2d 931, 933–34 (6th Cir. 1979). In the instant case, the trial record betrays no hint of partiality on the part of the district court. Rather, our contextual review of the district court's statements and questions convinces us that the district court's actions were intended to clarify rather than to cast favor upon either party.

Moore's arguments to the contrary ring hollow. For example, Moore argues that the district court "bolster[ed] . . . the credibility of the federal prosecution" by noting that local authorities used a phone app to translate during their interview with Ramirez. Appellant's Br., ECF No. 21, 22. However, if anything, the district court's statements concerning the use of the translation software was a benefit to Moore. As the district court noted, such apps are "a far cry from a live translator on the phone." Trial Tr., R. 228, Page ID #2767. In contrast, when introducing the translator who assisted Ramirez during her courtroom testimony, the district court noted that courtroom translators were "required to pass an extensive test so that they accurately interpret both the question to the witness and so that they accurately interpret the answer of the witness." Trial Tr., R. 224, Page ID #2348–49. The trial transcripts are replete with similar instances of the district court's balanced remarks, exemplifying its role as a neutral arbiter during the proceedings. No conduct challenged by Moore on appeal demonstrates that the district court's remarks or "questions were so phrased as to indicate any opinion on [its] part as to the veracity of the witnesses or as to the guilt of defendant." *Lewis*, 338 F.2d at 140. We therefore reject Moore's contention that the district court's conduct during witness testimony deprived him of a fair trial consistent with the guaranty of the Sixth Amendment.

**B. Expert Witness Testimony**

Moore next argues that the district court improperly excluded Burgess' expert witness testimony. Burgess is a network engineer who holds degrees in electrical engineering and computer science. Moore offered Burgess as an expert witness for cell site data analysis. Moore intended Burgess to analyze exhibits produced by the FBI's Cellular Analysis Survey Team concerning the historical cell site data of Moore's cellphone, which suggested that Moore was near the stores he was convicted of robbing at the time the robberies occurred. Moore concedes that

Burgess "had not had training specific to historical cell data analysis," but argues that Burgess' experience with the systems undergirding that technology allows him to understand and reliably analyze and testify to their accuracy. Appellant's Br., ECF No. 21, 25.

**Standard of Review**

In determining whether expert testimony is admissible, district courts play a pivotal gatekeeping role. *United States v. Thomas*, 167 F.3d 299, 308 (6th Cir. 1999). Our case law affords district courts "broad latitude" in exercising their authority in that role. *United States v. Ashraf*, 628 F.3d 813, 826 (6th Cir. 2011). We therefore review those expert-related decisions for abuse of discretion. *United States v. Gissantaner*, 990 F.3d 457, 463 (6th Cir. 2021). To find that the district court abused its discretion, we must be "left with the definite and firm conviction that the trial court committed a clear error of judgment." *United States v. Porter*, 886 F.3d 562, 566–67 (6th Cir. 2018) (order) (quoting *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 301 (6th Cir. 2016)).

**Analysis**

"For expert testimony to be admissible, the court must find the expert to be: (1) qualified; (2) her testimony to be relevant; and (3) her testimony to be reliable." *United States v. Anderson*, 67 F.4th 755, 767 (6th Cir. 2023) (per curiam). After conducting a *Daubert* hearing, the district court determined that Burgess was not qualified to render an opinion with respect to historical cell site data. The district court's determination in this regard does not provide us with the "definite and firm conviction that it committed a clear error of judgment." *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 781 (6th Cir. 2002).

To satisfy the qualification requirement for expert testimony consistent with Federal Rule of Evidence 702, an expert must possess the requisite knowledge, skill, experience, training or

education. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008). While acknowledging that Burgess had some familiarity with the technology underlying his proposed testimony, the district court concluded that Burgess lacked these qualities with respect to historical cell site information because he (i) was unfamiliar with call detail record ("CDR") data from the companies included in the government's proposed exhibit; (ii) did not have training in historical cell data analysis; (iii) never worked with domestic mobile telephone operators; and (iv) had never published his own analysis of cell site data. The district court also noted that, by his own admission, Burgess did not regularly work with CDR data and had not engaged with federal personnel on work concerning the operation of cellular networks since before the technology had radically evolved following the mid-2000s.

Instead of rebutting these conclusions on appeal, Moore seeks to sidestep them by emphasizing Burgess' knowledge of systems used to produce CDR data. *See* Appellant's Br., ECF No. 21, 25 ("While he had not had training specific to historical cell data analysis, his experience in building and configuring the systems is more than sufficient[.]"). However, the district court's analysis properly remained focused on the cell site data which Burgess' testimony was offered to critique. In so focusing, we cannot say that the district court took "an unduly narrow approach" to the subject of Burgess' proposed testimony. *First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 333 (6th Cir. 2001). We therefore find no abuse of discretion in the district court's decision to exclude Burgess as an expert witness. While criminal defendants have a fundamental right to present witnesses to establish their defense at trial, *see Emuegbunam*, 268 F.3d at 400, that right is not violated when a "court excludes evidence under a valid evidence rule and the defendant retains other ways to defend himself," *United States v. Sammons*, 55 F.4th 1062, 1074 (6th Cir. 2022). In the instant case, Moore remained able to defend himself from the admission of the

government's cell site data evidence by vigorously cross-examining the government's cell site data expert.

## C. Record Evidence

Moore also contends that the district court erred by admitting evidence of phone calls Moore made while in jail and images from a camera system used by MPD investigators. The phone call evidence was admitted through the testimony of Travis, and the camera system images were admitted through the testimony of Vlastos.

### Standard of Review

We review the district court's decisions to admit this evidence for an abuse of discretion. *United States v. Underwood*, 859 F.3d 386, 389 (6th Cir. 2017). "A district court abuses its discretion when it relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an erroneous legal standard." *United States v. Clark*, 634 F.3d 874, 878 (6th Cir. 2011). As such, we will not reverse the district court's determination absent a clear showing that it erred. *United States v. Williams*, 952 F.2d 1504, 1518 (6th Cir. 1991).

### Background

*Charita Travis.* At trial, Travis explained the Shelby County Sheriff's Office's process for retrieving recordings of calls placed by inmates from Shelby County jails. Travis noted that inmate-specific records identification ("R&I") numbers permitted officers to readily locate inmates' calls. Travis also noted that the Shelby County Sheriff's Office can listen to inmates' calls in real time and has access to call recordings once the calls are completed. Those recordings, Travis explained, are regularly maintained by the Sheriff's Office for as long as inmates are imprisoned or in active prosecution proceedings and are not alterable once stored on the Sheriff's

Office's servers. Travis recalled receiving a request, which was completed by her colleague, to use Moore's R&I number to identify jailhouse calls made by Moore.

***Kyle Vlastos.*** Vlastos testified about using the Flock camera network to investigate the robberies. Vlastos described Flock as "a network of cameras around the whole region" which allowed the MPD to search and identify cars by license plate number and the make of the vehicle. Trial Tr., R. 229, Page ID #3019. Vlastos noted that the cameras are maintained by different law enforcement agencies that shared access to their images through the Flock program. Vlastos testified that when a vehicle passes by a camera in the Flock network, the camera generates an image of the vehicle with a location, date, and time. He further explained that he and his fellow investigators regularly use Flock in investigations and that he had received training on the program but was "primarily self-taught on the program." *Id.* at Page ID #3026–27, 3029. When asked about the accuracy of the timestamps recorded by Flock cameras, Vlastos conceded that he has "never been able to verify the time stamps," but later confirmed that the MPD relies on the system as an accurate investigatory tool. *Id.* at Page ID #3027–28. The district court subsequently overruled defense counsel's objection to the reliability of the Flock camera images and issued the following jury instruction:

> THE COURT: Since you are the triers of facts in this case, we can receive this information. It's been sufficiently demonstrated that you can receive the data. And then you will decide how much weight you need to give to the particular information on this issue. And so as with almost everything, the jury will make the final decision as to what they believe is correct and accurate. And, of course, things that they believe are not reliable, you do not have to rely on it.

*Id.* at Page ID #3038. Following the jury instruction, Vlastos testified that he used the Flock system to identify vehicle images taken near the site of the third robbery which matched images of the black Impala from the various security camera images retrieved following the robberies.

**Analysis**

Moore argues that the district court erred by admitting a record of his jail calls because Travis was unable to testify to the recordkeeping practices employed by the company which the Shelby County Sheriff's Office used to record the calls. Moore also argues that the district court erred by permitting the government to introduce images from the Flock camera system because Vlastos was unable to verify the accuracy of the images' timestamps. We disagree on both points.

With respect to the Flock camera images, the crux of Moore's argument concerns the images' authenticity given Vlastos' sometimes equivocal testimony regarding the timestamps generated by the cameras. Images such as those produced by the Flock cameras may be admitted as evidence if their content is authenticated. *United States v. Smith*, 27 F. App'x 577, 583 (6th Cir. 2001). Authentication "can be accomplished in a number of ways—with testimony from someone with knowledge of the evidence offered, for example, or by pointing to distinctive characteristics that establish authenticity." *United States v. Farrad*, 895 F.3d 859, 876 (6th Cir. 2018). "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). We have previously observed that "[t]his requirement 'does not erect a particularly high hurdle' for a proponent to clear." *United States v. Hall*, 20 F.4th 1085, 1104 (6th Cir. 2022) (quoting *United States v. Dhinsa*, 243 F.3d 635, 638 (2d Cir. 2011)). The government cleared this hurdle in the instant case through Vlastos' testimony. Vlastos testified to his familiarity and regular use of the Flock cameras. In particular, he testified to the process by which

the cameras generate images with timestamps. Notably, "[n]o evidence was shown to suggest that the photographs were not 'accurate representation[s] of the scene depicted.'" *Farrad*, 895 F.3d at 878 (quoting *United States v. Hobbs*, 403 F.2d 977, 979 (6th Cir. 1968)). Defense counsel even disclaimed knowledge of such evidence upon the district court's inquiry. We therefore find that the district court did not abuse its discretion by admitting the Flock camera images.

We reach the same conclusion with respect to the records of Moore's phone calls. The district court admitted those records pursuant to the business records exception found in Federal Rule of Evidence 803(6). Moore argues that the government failed to lay a proper foundation for the introduction of the call-record evidence because Travis was unfamiliar with the recordkeeping process deployed by the Sheriff's Office and the company which the Sheriff's Office uses to record the calls. However, Moore's contention is belied by Travis' testimony, in which she described how the Sheriff's Office stores the calls. Travis explained that the Sheriff's Office stores the contemporaneously recorded call information "in a system called GTL" by using the R&I numbers unique to each inmate. We have previously noted that records custodians "need not be in control of or have individual knowledge of the particular corporate records, but need only be familiar with the company's recordkeeping practices." *United States v. Jenkins*, 345 F.3d 928, 935 (6th Cir. 2003). Travis, through her explanation of the recording and storage of jail calls, satisfied this requirement. We therefore find no "clear error of judgment" in the district court's decision to admit the call record evidence. *United States v. Stepp*, 680 F.3d 651, 660 (6th Cir. 2012).

### D. Cumulative Error

Moore also argues that the district court committed cumulative errors warranting reversal of his convictions. In doing so, Moore essentially contends that the district court violated his due process right to a fair trial. *United States v. Eaton*, 784 F.3d 298, 310 (6th Cir. 2015). To prevail

on this claim, he "must show that the combined effect of individually harmless errors was so prejudicial as to render his trial fundamentally unfair.'" *Underwood*, 859 F.3d at 395 (quoting *United States v. Warman*, 578 F.3d 320, 349 n.4 (6th Cir. 2009)). However, Moore cannot make this showing because, as explained above, we find that the district court did not commit any individually erroneous error. *Porter*, 886 F.3d at 568.

### III. CONCLUSION

For the reasons stated above, we **AFFIRM** the judgment of the district court.